Cheshire,  
May 4, 1931.

JOHN C. FAULKNER, JR., & a., *Ex'rs v.* KEENE.

*Chester B. Jordan*, for the plaintiffs.

*Henry C. Arwe*, for the defendant.

PEASLEE, C. J. Various objections are urged both against the form and the substance of the relief sought in this proceeding. These may be stated in the following order. I. That the declaratory judgment act (Laws 1929, c. 86) is unconstitutional. II. That the city does not make any claim of right which is subject to adjudication under said act. III. That the plaintiffs, having petitioned for a license under Public Laws, c. 162, s. 30, are now estopped to claim the right to act under the provisions of section 29 without license. IV. That the proposed construction is not within the provisions of section 29. V. That the action of the mayor and aldermen is not open to review, and VI. That the proposed use is in conflict with the defendant's valid zoning ordinance.

I. The claim that Laws 1929, c. 86 is unconstitutional has been urged upon two grounds. It is asserted that the act would deny a jury trial or recourse to the supreme court on issues of law. Neither position is well taken. The act provides that "Any person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title, to determine the question as between the parties, and the court's judgment or decree thereon shall be conclusive." *Ib.*

This act was in terms made an addition to chapter 316 of the Public Laws. It is to be read and construed as a part of that chapter. So considered, its import is not doubtful. Its purpose is to make disputes as to rights or titles justiciable without proof of a wrong committed by one party against the other. The case proceeds to final judgment or decree precisely as any other litigation might. Exceptions may be taken during the trial, or questions of law may be transferred by the presiding justice *sua sponte*, under other provisions of the same chapter. Proceedings of the latter class have heretofore been taken, and have been acted upon in this court without question. *Second National Bank* v. *Savings Bank*, 84 N. H. 342. It is therefore unnecessary to consider the novel proposition that the legislature has no power to make the decision of a court of first instance final, both as to law and fact.

The objection as to jury trial is not open to the defendant as the case stands. The constitutional provision for a right to such trial "except in cases in which it has been heretofore otherwise used and

practiced" (Const. Pt. I, *art.* 20) would seem to be applicable here. If so, and there be an issue of fact between the parties, either might claim the right, save in those exceptional cases, as for example an accounting or a controverted equity, where the right did not exist at common law. · But since the defendant made no request for a jury trial in this case, there is no occasion to consider whether such a request, if made, should have been granted. The questions whether this defendant has any standing to assert a right to a jury trial (*Wooster* v. *Plymouth*, 62 N. H. 193), and whether there is such a right in this class of proceedings, are not decided.

Another aspect of the constitutional question is to be considered. Some things said in the opinion in *Harvey* v. *Harvey*, 73 N. H. 106, might indicate that the constitution forbids such extention of jurisdiction as the act of 1929 contemplates. The declaration therein that the court cannot be empowered to give advice, save in the instances specified in the constitution (Article 74), is undoubtedly sound. The reasons therefor are set forth in the authority there cited. *In re School-Law Manual*, 63 N. H. 574, 575. "A prospective determination of the validity of these rules and forms, without notice and opportunity of hearing given to persons whose interests may be involved in the facts and the law of a particular case, would not be an exercise of judicial power. Cool., Const. Lim. 91, 353, 354; *Merrill* v. *Sherburne*, 1 N. H. 199, 203, 204. Who will be entitled to notice, and what objections will be presented, cannot now be ascertained. Questions which cannot be anticipated may arise in cases that cannot be foreseen, concerning rights not yet accrued and persons not yet in existence."

It seems evident that these reasons had no application in the *Harvey* case, which was a dispute between the holder of a defeasible fee and the parties to whom it was to go over, as to the right of the former to deal with the title in a certain way. The refusal to consider the question may be justified upon the ground that jurisdiction to act in such a case had not then been conferred. But the implications that the constitution forbids granting such jurisdiction, and that if the question were decided the decree would be merely advisory do not appear to be tenable.

The advice-giving power of the court is limited by the constitution, by virtue of the provisions that all interested parties are entitled to be heard, and by unprejudiced judges. Where there is adequate provision for notice and hearing, and those adversely interested are brought before the court, these constitutional limitations do not apply.

The constitution does not prohibit the fixation of rights, as between parties who are in court. What it does forbid is a failure to give all interested parties notice and an opportunity to be heard before any decree affecting their rights is made. Beyond this there is no constitutional limitation upon the stage of the controversy at which the courts may be appealed to by the contending parties.

"To compare the claims of parties with the laws of the land before established, is in its nature a judicial act." *Merrill* v. *Sherburne*, 1 N. H. 199, 204. And when a statute provides that a decree shall settle an issue as between the parties, it cannot well be asserted that rights are not adjudicated upon and conclusively settled by a decree thereunder. The result of such a proceeding is not merely advice, but an authoritative determination of rights. A judgment determining rights "will be conclusive without service of any process for its enforcement." *Walker* v. *Walker*, 63 N. H. 321, 327.

Even the federal court, which has rendered opinions, if not decided cases, adversely to the validity of declaratory judgment acts, now holds that "While ordinarily a case or judicial controversy results in a judgment requiring award of process of execution to carry it into effect, such relief is not an indispensable adjunct to the exercise of the judicial function." *Fidelity Nat. Bank & Trust Co.* v. *Swope*, 274 U. S. 123, 132. This point was re-affirmed in *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 725.

In several instances this remedy has heretofore been treated as available in this state. Process to compel unwilling claimants to forthwith litigate their claims has been used since early times. The right of a trustee to be assured in advance of the proper course for him to pursue and the bill to remove a cloud from the title to real estate are of this class. Proceedings by insurers or guarantors to compel the delivery and cancellation of outstanding undertakings are sometimes of like character. The statutory remedy for one in possession, against a claimant out of possession (P. L., *c.* 317, *s.* 3), is a fragment of the more general provision for declaratory judgments. And going still further, claimants may be ordered into court when both of them object to the present litigation of their contentions. The stakeholder may interplead them. It has also been said that "when the question of construction has been fully argued by all parties interested and both desire the opinion of the court, a court may express its opinion although dismissing the petition. *Austin* v. *Bailey*, 163 Mass. 270." *Glover* v. *Baker*, 76 N. H. 393, 399. The practice of transferring questions of law in advance of a trial of the facts was sus-

tained in that case, upon an exhaustive examination of the subject. Although no judgment follows such a decision, it is much more than mere advice to the parties.

The remedy provided by the act is not a novel one, although it has been but little used in this country until recently. The declaration of right, without other judicial action, was a remedy recognized and used under the civil law. From thence it was adopted in some European countries, especially Germany and France. The Scottish adoption of a large part of the theories and practices of the civil law led to its use in that country, where it has been available for four hundred years. From time to time English judges called attention to its desirability (*Earl of Mansfield* v. *Stewart*, 5 Bell 139), and it was adopted there in limited form in 1852. In 1883 it was made general by a rule providing that no action or proceeding should be open to objection because it called for, or was susceptible of, a declaratory judgment only. 28 Yale Law Jour. 1, where the history of the subject is fully reviewed.

Since the decision of *Washington-Detroit Theatre Co.* v. *Moore*, 249 Mich. 673, which in substance overruled *Anway* v. *Railway*, 211 Mich. 592, the state courts are unanimous in the view that there is legislative power to confer such a remedy. 68 A. L. R. 110, *note*.

The opposite declaration by the federal supreme court is not based upon satisfactory reasoning. The position there taken has been thoroughly answered by Professor Borchard in a very recent article entitled "The Constitutionality of Declaratory Judgments." 31 Columbia Law Rev. 561. The exception taken upon the ground that the declaratory judgment act is unconstitutional is overruled.

II. It is said that there is here no claim of right adverse to the plaintiffs' title which can be adjudicated under Laws 1929, c. 86.

The petition alleges that rights in derogation of the plaintiffs' title are being asserted in two particulars. The city maintains that the proposed structure cannot be used as intended without a license, and that its zoning ordinance would be violated by certain aspects of the proposed use. It now takes the position that this is merely an assertion of its right to exercise its police power, and therefore not to be treated as the claim of any legal or equitable right touching the plaintiffs' property. Hence, it is argued that no controversy justiciable under the act of 1929 is presented.

It appears that the position taken by the city as to the effect of the statute and ordinance has resulted in preventing the plaintiffs from making an advantageous disposal of the property. This result has

come about because of doubt as to the plaintiffs' right to the unrestricted use of their land. According to the defendant's claim, their title is materially limited. If in a technical sense it may be said that certain of their rights have been extinguished, rather than transferred to others, yet in another and practical sense it is true that they have been transferred. That part of the public affected by the use of the land are the gainers by the limitation of that use. The rights thus created, and the limitations imposed, are of a like nature to negative easements, which unquestionably limit titles. *First Nat'l Bank* v. *Bank*, 71 N. H. 547; *Foster* v. *Foster*, 62 N. H. 46.

In their police matters, the city represents its public. It appears in their behalf and asserts claims for their benefit. In that capacity it could not only institute criminal proceedings, but might maintain a bill to restrain the use, if illegal. It has in substance asserted such right in its answer to this proceeding. If the defendant had brought such a bill, either before or after the contemplated construction was undertaken, no one would doubt that it presented issues of rights claimed and denied and susceptible of judicial determination. *Concord* v. *Morgan*, 74 N. H. 32.

The substantive issues, those concerning rights as distinguished from the remedy for a wrong, are the same here that they would be upon such a bill. The questions whether the structures were those recognized as proper under the statute, and whether the zoning ordinance forbids the proposed use of the front lot, would be passed upon and conclusively determined in such a proceeding. It would be a narrow and technical construction of a remedial statute to conclude that such controversies are not included within the terms of the act of 1929.

A complaint and warrant instituted by the city officials and charging the violations here alleged would present the issue sought to be raised here, and a verdict of not guilty would be an effectual bar to any further proceeding on behalf of the state. But if it were conceded that, in so far as threat of criminal proceedings for violation of the statute or ordinance is made by the city, it is on behalf of the state, and that the city does not represent the state for the purpose of asserting the rights of the public as to such proceedings, it would not follow that the present petition is not maintainable. As to the matter of preventive relief by way of injunction, the city is clearly in a position to assert rights and seek relief.

The fact that the rights asserted by the defendant were created by statute or ordinance, enacted in the exercise of the police power, does

not make them unreal or unenforceable. In every substantial sense they are rights asserted against the plaintiffs' property.

Thus it has been held that the mere enactment of a statute or ordinance limiting the use of property, without any attempt to apply it to the complaining party, made cause for injunctive relief. "The existence and maintenance of the ordinance, in effect, constitutes a present invasion of appellee's property rights and a threat to continue it." *Euclid* v. *Company*, 272 U. S. 365, 386. And in *Pierce* v. *Society*, 268 U. S. 510, the court enjoined the enforcement of a statute two years before it was to go into effect.

The issue here is not whether such rights against the plaintiffs could be created, but whether they have been. In the language of the act, there is a claim of legal right or title on the part of the plaintiffs, which is denied by the defendant, because of the statute and the ordinance. There is here no attempt by the plaintiffs to question the right to restrict the use of property, by the exercise of the police power, nor to control or direct the manner in which such power should be put forth. The issue is whether the rules which have been established cover the present situation and forbid the proposed use.

If it is necessary, in order to dispose of the controversy, to ascertain the meaning of a pertinent statute, that matter is to be dealt with as it would be in any other litigation. Cases holding that statutes cannot be interpreted in such a proceeding fail to consider the true purpose and scope of an act like the one here under consideration. *Burghes* v. *Attorney-General*, [1911] 2 Ch. 139; *Dyson* v. *Attorney-General*, [1911] 1 K. B. 410; *Taylor* v. *Haverford*, 299 Pa. St. 402.

"The complaint is that officers of the Crown are demanding information they are not entitled to, and, to say the least of it, reminding the subject of unpleasant consequences which may ensue if it is refused. It seems to me immaterial whether the terms of the notice amount to an actual threat; the reference to the penalty is plainly intended to intimate to the plaintiff that compliance can, and will, be compelled if necessary. If the question be not decided in this way it must be left open until the plaintiff, having refused to comply, is sued for penalties, and the plaintiff would be left in a position of great perplexity. In my opinion, the mode adopted by the plaintiff for obtaining a decision is a very convenient one, enabling the Commissioners to be informed how far they may go, and relieving the plaintiff from the doubt and perplexity into which he has been cast." *Burghes* v. *Attorney-General*, *supra*, 155.

As before suggested, this remedial act should not be restricted by a

narrow interpretation of its scope. It is apparent from an examination of the cases that not all courts have viewed the innovation favorably. In some instances the language of the acts has been such as to greatly restrict the usefulness of the remedy. It was long doubted in England whether the proceeding could be maintained by one seeking a negative decree. But it is now settled that it is available there to one asking that a right asserted against him be declared invalid. *Guaranty Trust Company* v. *Hannay & Co.*, [1915] 2 K. B. 536.

It has sometimes been said that the proceeding could not be used merely to establish a fact, as distinct from any jural relation. *Gifford* v. *Trail*, 7 Shaw 854 (1829). Yet where facts must be ascertained in order to determine the legal right, the factual issues will be tried. *In re Wilkinson's Estate*, [1917] 1 Ch. 620.

In some of the states difficulties have been found in the limitations imposed by the restrictive language of the act. See *Dreiser* v. *Company*, 171 N. Y. Supp. 605. No such obstacles are presented under a general statute like the English provision, as now interpreted. The act here involved is of that character. Its effect is simply to make a controversy over a legal or equitable right or title justiciable at an earlier stage of the controversy than that which gave rise to a cause of action at common law, or to enable the normal defendant to institute the proceedings. It makes no difference whether the claim be in positive or negative form, or whether it involves issues of fact. If the controversy be one that would be justiciable under the law, provided either party had violated the right claimed by the other, it is justiciable under the act as soon as the essential facts arise. Claim of legal or equitable right on the one hand and its denial on behalf of an adverse interest constitute a cause for proceeding for a declaratory judgment.

It may be that proceedings under the act of 1929, like those under the earlier and similar statute relating to real estate titles (P. L., c. 317, s. 3), are limited to cases where existing legal remedies do not cover the case. (*Walker* v. *Walker*, 63 N. H. 321.) The present situation falls within that class. The plaintiffs have no other remedy for the establishment of their disputed rights. It is true that they might translate their claims into action, and await prosecutions or proceedings to enjoin or to abate. But that is precisely the dilemma from which the act of 1929 was designed to afford relief. *Burghes* v. *Attorney-General*, [1911] 2 Ch. 139. As Professor Borchard has well expressed it, where this procedure has been provided, the court does not say to "the prospective victim that the only way to determine

whether the suspect is a mushroom or a toadstool is to eat it." 31 Columbia Law Rev. 561, 589.

It should also be said that under our liberal practice the distinction between causes that properly come under the provisions of the act of 1929 and those maintainable without the aid of that statute is not of much practical importance. The cause being plainly presented to the court, the appropriate remedy will be granted, however erroneously the proceeding be entitled.

There seems to be no reason why the proceeding should not be used as an alternative one, or as auxiliary to other proceedings wherein an executory judgment is sought. Such is the common practice in England. 28 Yale Law Jour. 149. See also *Alfred E. Joy Co.* v. *Company*, 98 Conn. 794.

This brief review of the general situation upon this branch of remedial procedure, and of the attitude towards it, both here and elsewhere, is designed to show that the remedy, while somewhat novel in appearance here, is one long recognized elsewhere, and that in its essence it is a highly desirable contribution to the efficiency of courts in the administration of justice.

The objections to it are the product of undue conservatism. "We have canonized the ancient tradition of a cause of action, in all its original crudeness, and have made it the condition and the measure of judicial action. We have failed utterly to see the enormous and far-reaching possibilities in preventive relief,—prevention not merely of threatened wrongs but prevention of uncertainty and misunderstanding in the assertion of rights. Yet here is an effective, workable system, tried out under conditions identical with those in our own country, which makes an advance over previous doctrines comparable to the great reform which equity made over the harsh rules of the common law. Its use would entail no reconstruction of our judicial machinery, no readjustment of other elements in our remedial system. Its theory and operation are perfectly simple." 16 Mich. Law Rev. 69, 89.

Statutes designed to confer such jurisdiction should be construed so as to effectuate their evident purpose. Questions will undoubtedly arise as border line cases are presented. It is sufficient for the disposition of the present controversy to decide that the issue as to the application of the statute and ordinance involved is a proper matter to be determined in such a proceeding, that the situation of the plaintiffs entitles them to invoke the judgment of the court, and that the claims of the defendant are adverse in a sense covered by the act.

The decisions in other jurisdictions considering these and other features of this remedy, are collected and commented upon in the notes in 12 A. L. R. 52; 19 A. L. R. 1124; 50 A. L. R. 42; 68 A. L. R. 110. See also 31 Columbia Law Rev. 561; 28 Yale Law Jour. 1, 105.

III. The position that the plaintiffs have estopped themselves to claim that the proposed use of the property is governed by section 29 of chapter 162 of the Public Laws by applying for a license under section 30, is untenable. Their conduct in that matter has not caused anyone to act or refrain from acting on faith of the petition. The city has not altered its position in any way. An estoppel does not arise under such circumstances. *Duval* v. *Insurance Co.*, 82 N. H. 543, and cases cited.

The substance of the controversy is to be considered in this proceeding.

IV. Coming to the merits of the case, it is urged that underground metal containers for gasoline are not buildings, and that therefore a local license for such use is required. The sections of the statute in question read as follows.

"Crude petroleum or any of its products may be stored, kept, manufactured or refined, in detached and properly ventilated buildings specially adapted to the purpose, and surrounded by an embankment constructed so as effectually to prevent the overflow of the petroleum or any of its products beyond the premises on which the same may be kept, manufactured or refined, said buildings to be occupied in no part as a dwelling; and if less than fifty feet from any other buildings they must be separated therefrom by a stone or brick wall at least ten feet high and twelve inches thick. Any person keeping such articles in any other kind of building, except as provided in the following section, shall be punished . . .

"No person shall manufacture, refine, mix, store or keep for sale any oil or fluid composed wholly or in part of any of the products of petroleum, in any city or town, except as provided in this chapter, without a license from the mayor and aldermen of the city or the selectmen of the town. The license shall state the manner, and the portion of any locality or building, in which the articles may be mixed, stored or kept; . . ." P. L., *c.* 162, *ss.* 29, 30.

Several reasons are advanced for the claim that the underground tanks which it is said are proposed to be installed for the storage of gasoline are not permitted under the provisions of section 29. It is first said that when this statute was adopted in 1873 (Laws 1873, *c.* 44) present day filling stations were unknown and that therefore the

act should not be applied to them, save when clearly within the letter of the law. It is a sufficient answer to this argument to call attention to the fact that the statute was reënacted in 1878 (G. L., c. 122, s. 34), in 1891 (P. S., c. 126, s. 29) and again in 1925.

Moreover, "It is a rule of statutory construction, recognized in this state, that legislative enactments in general and comprehensive terms, prospective in operation, apply alike to persons, subjects and business within their general purview and scope existent at the time of the enactments and to those coming into existence subsequent to their passage." *Haselton* v. *Stage Lines*, 82 N. H. 327, 332. Earlier authorities to the same effect are there cited.

Complaint is next made that the proposed construction does not provide for an embankment to prevent overflow from the building in which it is proposed to store a comparatively small quantity of kerosene and lubricating oils. The statute does not undertake to fix the location of the embankment, further than to prescribe that it shall surround the containers. There was evidence that the land in question is lower than that surrounding it, and the finding of the presiding justice that the proposed construction would "effectually prevent the over-flow beyond the premises" disposes of this contention. The fact that the embankment is natural rather than artificial does not make it objectionable.

It is said that storage tanks sunk in the ground are not buildings within the meaning of the statute. There is nothing in the transferred case relating to such tanks. The only construction spoken of in the evidence or referred to in the findings is the small building, such as is commonly erected for a filling station and in which lubricating oils and kerosene are kept. As a matter of common knowledge of the way such places of business are now quite uniformly established, and by reference to a plan which is made a part of the case, it may be assumed that such tanks are to be installed. The reason they were not objected to at the trial is not far to seek. No one would think they offended against the objects of the statute. Here, as in *State* v. *Uhrig*, 82 N. H. 480, the point was conceded at the trial.

But as the issue has now been raised, and may be material to the settlement of the rights involved, it has been considered. The sole purpose of the statute is protection from fire hazards. The construction now objected to is one that eliminates the dangerous features incident to storage in structures above ground. While not technically within the language of section 29, it is clearly within the spirit and intent thereof, and is therefore included therein. *Noyes* v. *Marston*,

70 N. H. 7, 22; *Vandell* v. *Sanders, ante,* 143. It would be an anomalous situation if these parties could store gasoline in an inflammable building without license, but must secure permission to keep it in non-inflammable underground tanks. *Concord* v. *Morgan,* 74 N. H. 32.

Another position taken at the argument is that since the plan shows four separate tanks, not fifty feet apart, the construction would violate the provisions that the "buildings . . . if less than fifty feet from any other buildings . . . must be separated therefrom by a stone or brick wall . . ." P. L., c. 162, s. 29. It is manifest that this provision has no reference to a separation between the units of a plant. It relates solely to the protection of outside property from the plant taken as a whole.

V. The conclusion that the proposed construction would be in compliance with Public Laws, chapter 162, section 29 makes the issues as to the refusal of the mayor and aldermen to grant a license under section 30 immaterial.

VI. The land in question lies southerly of West street in Keene. By the zoning ordinance of that city the first twenty-five feet, southerly from the street, is restricted to residential uses, the next one hundred feet to business uses, while the part beyond that may be used for industrial purposes. The plan is to erect the gasoline storage and sale plant on the second tract, and to approach it by driveways from the street and across the first tract. The defendant does not claim that such driveways would violate the terms of the ordinance as to the use of the twenty-five foot strip, restricted to residential uses. Its claim is that the real purpose is to open up the whole of the twenty-five foot strip for an approach to the filling station, and that, considering the customary use of such premises, it is apparent that this will result in using that land to transact business with customers who do not desire tank service.

It is a sufficient answer to this position to point out that the statement of right by the presiding justice has no reference to such use. The question passed upon was the reasonableness and permissibility under the ordinance of using "the twenty-five foot strip for ingress and egress to lots B. and C." No right to use it for any other purpose has been declared, and the question argued is not presented by the exceptions.

The statement of the rights of the parties as framed by the presiding justice is correct in law; and in so far as it involves findings of fact it is supported by sufficient evidence.

*Exceptions overruled.*

ALLEN, J., did not sit: the others concurred.