Crumpton v. Crumpton

RUTH HARRIS CRUMPTON; RUTH C. GREEN AND HUSBAND, EDWARD W. GREEN, JR.; REBECCA C. SAUNDERS AND HUSBAND, CLINTON L. SAUNDERS; DIANA C. TUCK AND HUSBAND, TONY M. TUCK AND MARIAN C. MONK AND HUSBAND, THOMAS A. MONK, SR., PETITIONERS v. MALCOLM H. CRUMPTON AND WIFE, SANDRA H. CRUMPTON; EMMET GARRETT CRUMPTON AND WIFE, JUDY S. CRUMPTON; WILLIAM R. CRUMPTON, III AND WIFE, KAREN L. CRUMPTON; HARRIS CRIGGER CRUMPTON AND WIFE, DEBBIE CRUMPTON; STEVE CRUMPTON AND WIFE, SHARON CRUMPTON; BROOKS CRUMPTON, SINGLE; KNOX MITCHELL, SINGLE; GEORGE EDWARD MITCHELL AND WIFE, MARY MITCHELL; ROSE C. GREGORY, WIDOW; SHARON LYNN CRUMPTON; TONIA ROBIN CRUMPTON; LISA ANN CRUMPTON; DOUGLAS JAY CRUMPTON; CHAD ALLEN CRUMPTON; MISHA CRUMPTON; SHANEL CRUMPTON; WILLIAM ROBERT CRUMPTON, IV; SANDRA JOYCE CRUMPTON; RONDA LYNN CRUMPTON; AMY GARRETT GREEN; BRENDA GAIL SAUNDERS; CLINTON MARK SAUNDERS; WILLIAM MERRITT SAUNDERS; ANTHONY DARRON SAUNDERS; CHRISTOPHER JASON SAUNDERS; TONY MARTIN TUCK, JR.; THOMAS A. MONK, JR. AND WIFE, CAROLYN MONK; TAMMY MONK; CHRISTY MONK; CHARLES WILLIAM MONK; PAMELA GREGORY; MICHELLE MITCHELL; MRS. G. K. HARRIS, WIDOW; DOLIAN HARRIS AND WIFE, JANE KIRBY HARRIS; GEORGE E. HARRIS AND WIFE, KATHRINE HARRIS; JESSIE H. WADE, WIDOW; DOROTHY G. HARRIS, WIDOW; ROBERT EARL JAMES, SR., WIDOWER; BENJAMIN WILLIAM JAMES AND WIFE, JOYCE EVERETTE JAMES; ROBERT E. JAMES, JR. AND WIFE, GRACE F. JAMES; BETTY J. THOMPSON, WIDOW; KATIE HARRIS, SINGLE; CORINE H. GRANT, WIDOW; ELLA H. WINSTEAD AND HUSBAND, FRANK WINSTEAD, SR.; AND NETTIE LOU BULLOCK, RESPONDENTS

No. 759SC603

(Filed 21 January 1976)

**Adoption § 5; Descent and Distribution § 5— adopted children — deed to natural grandmother with remainder to issue — no remainder in children**

    In a proceeding for a private sale of land with the proceeds of the sale to be held in trust for the life tenant and at her death the proceeds remaining to be distributed "to her issue then living, per stirpes," the trial court properly concluded as a matter of law that two children of one of the life tenant's deceased sons, by virtue of a final order of adoption, were removed from the bloodline of the life tenant and owned no remainder interest in the subject land or in the proceeds from the sale thereof. G.S. 48-23.

APPEAL by respondents from order of *Giles R. Clark, Judge.* Order entered 6 June 1975, in Superior Court, PERSON County. Heard in the Court of Appeals 23 October 1975.

The facts of this case are not in dispute. On 1 December 1941, G. E. Harris and his wife conveyed a tract of land in Person County to "Ruth Harris Crumpton for the term of her natural life, with remainder to her living issue, per stirpes,

. . . " The habendum clause of the deed provided that the grantee should hold the land "for and during the term of (sic) natural life, and at her death to her issue then living, per stirpes; Provided, however, that if she has no issue then living said land shall revert to the heirs at law of the grantor G. E. Harris." Ruth Harris Crumpton is still living. Two of her children are still living. A son, William Robert Crumpton, Jr., is deceased and left surviving him six children, all of whom are now living. A deceased son, George Edward Crumpton, who died in 1962, had five children. Two of his children—George Edward Mitchell, born 17 March 1943, and Edgar Knox Mitchell, born 16 December 1945—were adopted from him on 13 June 1955 in Guilford County. These two children are living and are the appealing respondents in this action. The other three children of George Edward Crumpton are also now living.

On 9 December 1974, petitioner, Ruth Harris Crumpton, and others, brought a special proceeding for a private sale of the land, with the proceeds of the sale to be held in trust for the life tenant and at her death the proceeds remaining to be distributed "according to law and according to the terms of the said Deed."

The two Mitchell children were included among the respondents. The only contested issue was whether the two Mitchell children, or their issue in the event either or both should predecease Ruth Crumpton, should share in the proceeds of the sale. The clerk entered an order directing a sale of the land and providing that George Edward Mitchell and Knox Mitchell would share in the proceeds of sale if they survived Ruth Crumpton and if either or both should predecease her their children would take in the same manner as children of the other three children of George Edward Crumpton. To this conclusion of law, the other three children of George Edward Crumpton excepted and appealed to the Superior Court. After hearing, the court entered an order concluding that "as a Matter of Law . . . the Respondents, George Edward Mitchell and Edgar Knox Mitchell by virtue of the Final Order of Adoption dated June 13, 1955, were removed from the bloodline of Ruth Harris Crumpton and own no remainder interest, vested or contingent, in the subject lands or in the proceeds from the sale thereof; . . . " From this order, Knox and George Edward Mitchell, the guardian ad litem for their children in esse, and

the guardian ad litem for any unborn or unknown issue of theirs, appealed.

*Graham, Manning, Cheshire & Jackson, by Lucius M. Cheshire and James W. Tolin, for petitioner appellees.*

*Ronnie P. King for Knox Mitchell and George Edward Mitchell and his wife, Mary Mitchell, respondent appellants.*

*Alan S. Hicks, Guardian Ad Litem for Michelle Mitchell and any unknown or unborn persons being or being asserted to be the issue of Edgar Knox Mitchell or George Edward Mitchell, respondent appellant.*

MORRIS, Judge.

The narrow question presented by this appeal is one of first impression in this State and requires examination and interpretation of certain portions of Chapter 48 of the General Statutes dealing with the adoption of minors.

Our Supreme Court has said that since the adoption statute " . . . is in derogation of the common law and works a change in the canons of descent, it must be construed strictly and not so as to enlarge or confer any rights not clearly given." *Grimes v. Grimes,* 207 N.C. 778, 780, 178 S.E. 2d 573 (1935).

Although relatively new to this country, and even newer to England, the history of adoptions dates back to antiquity and the procedure was known to and used by the Babylonians, Hebrews, Egyptians, Romans, Spartans, Athenians, and the ancient Germanic people. Kuhlmann, Intestate Succession by and from the Adopted Child, 28 Wash. U.L.Q. 221 (1943) ; Fairley, Inheritance Rights Consequent to Adoptions, 29 N. C. L. Rev. 227 (1951). The first adoption statute enacted in this country was probably the Massachusetts statute, adopted in 1851. The General Assembly of North Carolina in 1873 adopted a statute containing basically the same provisions as the Massachusetts statute. Unquestionably there was no sanction, at common law, for the creation of a legal parent-child status by the procedure of adoption, and it was not until 1926 that legal adoptions were made possible in England. However, by 1936, all states in this country had enacted legislation providing for adoption of minors. Therefore, it appears that the common law policy against adoption is now and has been for a good many years gone from the scene. The statutes providing for adoption of minors afford

a procedure whereby the child is taken from his natural family and made a member of a new family with full standing as though one of the blood of his new family. This result, with its attendant property rights, has evolved over a period of years, the reaching of the goal having necessitated amending and even rewriting of the adoption statute. An in depth discussion of the North Carolina adoption statutes and Supreme Court decisions on the subject can be found in Vol. 29 N. C. L. Rev. 227 covering the period up to 1951.

The first statute, and all amendments up to 1941, provided that when a child was adopted for life, the reolationship of parent and child was established "with all the duties, powers and rights belonging to the relationship of parent and child" and the adopted child was entitled to the *personal* estate of the *petitioner* in the same manner and to the same extent as if a natural child of the petitioner with the proviso that the petitioner could prevent the child's taking by specifically so stating that intent in the petition for adoption. See N. C. Revisal, C. 2, § 175 (1905).

In 1941 the adoption statute was rewritten, and the provision with respect to rights of inheritance was changed for the first time since 1873. This statute continued the distinction between adoptions for the minority of the child and those for the life of the child. When the adoption was for life, " . . . succession by, through, and from adopted children and their adoptive parents shall be the same as if the adopted children were the natural, legitimate children of the adoptive parents. Succession by children adopted for life and their lineal descendants from or through their natural parents or by or through the natural parents from such adopted children or their lineal descendants shall take place only where but for such succession the State of North Carolina would succeed to the intestate's property. Further, for all other purposes whatsoever a child adopted for life and his adoptive parents shall be in the same legal position as they would be if he had been born to his adoptive parents." G.S. 48-6 (1941). This provision clearly changed the law necessitating the holding in *Edwards v. Yearby,* 168 N.C. 663, 85 S.E. 19 (1915), that a natural parent inherited from a deceased minor to the exclusion of the adoptive parent. The provisions of G.S. 48-6 were made applicable only to adop-

tions made after 15 March 1941. In 1949, a 1947 rewrite of the statute was adopted, and § 48-23 provided:

> "The final order forthwith shall establish the relationship of parent and child between the petitioners and the child, and, from the date of the signing of the final order of adoption, the child shall be entitled to inherit real and personal property from the adoptive parents in accordance with the statutes of descent and distribution."

The legislation omitted the provision allowing inheritance by, from or through natural parents, and vice versa, only to prevent escheats, and the statutes of descent and distribution provided for the succession and inheritance rights in and to real and personal property of adopted children and adoptive parents. G.S. 29-1(14), (15), (16) and G.S. 28-149(10), (11), (12). By amendments enacted in 1955 adopted children were specifically prohibited from inheritance or succession rights to real and personal property by, through, or from a natural parent and the natural parents were prohibited from any entitlement to real or personal property by succession or inheritance by, through, or from such adopted child. G.S. 28-149(10) and (11) and G.S. 29-1(14) and (15). Also in 1955, the General Assembly again reiterated the intent to create a different legal status by the following language:

> "An adopted child shall have the same legal status, including all legal rights and obligations of any kind whatsoever, as he would have had if he were born the legitimate child of the adoptive parent or parents at the date of the signing of the final order of adoption, except that the age of the child shall be computed from the date of his actual birth." G.S. 48-23.

In 1963, the rights of the adopted child were further particularly spelled out when the General Assembly provided:

> "From and after the entry of the final order of adoption, the words 'child,' 'grandchild,' 'heir,' 'issue,' 'descendant' or an equivalent, or the plural forms thereof, or any other word of like import in any deed, grant, will or other written instrument shall be held to include any adopted person, unless the contrary plainly appears by the terms thereof, whether such instrument was executed before or after the entry of the final order of adoption and whether such

instrument was executed before or after the enactment of this Act." G.S. 48-23(c) (1963), now G.S. 48-23(3).

It seems abundantly clear that the General Assembly, on its own motion and also in response to judicial decisions, has, with every amendment and every rewrite of the adoption statute, evidenced its intent that by adoption the child adopted becomes legally a child of its new parents, and the adoption makes him legally a stranger to the bloodline of his natural parents. See *Rhodes v. Henderson,* 14 N.C. App. 404, 188 S.E. 2d 565 (1972).

The statute relieves the natural parents of all legal obligations, divests them of all rights with respect to the person adopted, and with respect to the person adopted, gives him the same legal status he would have had if he were born the legitimate child of the adoptive parent or parents at the date of the signing of the final order of adoption. We agree with Justice Higgins who quoted with approval 33 N.C.L. Rev. 522:

> " 'Here is a simple and clear rule which eliminates all doubt as to the standing and rights of an adopted child. For all legal purposes he is in the same position as if he had been born to his adoptive parents at the time of the adoption. . . Whatever the problem is concerning an adopted child, his standing and his legal rights can be measured by this clear test: "What would his standing and his rights be if he had been born to his adoptive parents at the time of the adoption?" ' " *Headen v. Jackson,* 255 N.C. 157, 159, 120 S.E. 2d 598 (1961).

We think the language of the New Hampshire Court in construing an adoption statute appropriate here:

> "By section 4 of the adoption statute (P.L. c. 292) the adoption decree makes the child 'the child of the petitioner to all legal intents and purposes.' Giving language its ordinary meaning and giving weight to the policy the statute discloses, the conclusion follows that adoption establishes a change of status by which in general the relatives become strangers in legal aspect and others take their place. The view taken in *Baker v. Clowser,* 158 Iowa, 156, 138 N.W. 837, 840, 43 L.R.A. (N.S.) 1056, that the statute 'in its broadcast interpretation only attempts to fix the relation between the adopted child and the adopting parent,' is too narrow when the natural and expected consequences

of the adoption are regarded. Nor does the rule employed in many cases elsewhere, that statutes in derogation of the common law are to be strictly construed, have any forceful bearing here. If a statute on a subject not recognized by the common law may be thought derogatory thereto, the rule has here been virtually suppressed by the predominant rule that all legislation shall be fairly construed according to its evident purpose. *Faulkner v. City of Keene*, 85 N.H. 147, 154, 155, 155 A. 195; *Mulhall v. Nashua Mfg. Co.*, 89 N.H. 194, 115 A. 449; *Clough & Co. v. Boston & M. Railroad*, 77 N.H. 222, 230, 90 A. 863, Ann. Cas. 1915B, 1195, and cases cited.

The statute does not seek to wholly destroy the natural ties of affection and interest between an adopted child and his own relatives. But broadly the law looks upon the child as it does a natural child of the adopting parents. The general purpose of the statute to free the child from his status arising from his relationship by blood, and to give him a new status as between him and those adopting him and their kindred, seems free from doubt. He is taken in legal contemplation from his natural family and made a member of a new family. Becoming the legal child of the petitioner, he enters the latter's family with nearly full standing as though one of its blood. The natural incidents therefrom are expected to follow." *Young v. Bridges*, 86 N.H. 135, 165 A. 272, 275 (1933).

The statute mandates that an adopted child shall have the same legal status as he would have had if he were born the legitimate child of the adoptive parents at the date of the final order of adoption. G.S.48-23 (1). In this case, at the date of the final order of adoption—13 June 1955—Knox and George Edward Mitchell acquired the legal status of natural born children of their adoptive parents. One of the natural incidents resulting from this new status was that legally both children became legal strangers to the bloodline of their father, the son of the grantee in the deed conveying the property. No interest in the property had vested in them, and at that time, they, by force of the statute, ceased to be children of George Edward Crumpton and became the children of their parents by adoption. *Stamford Trust Co. v. Lockwood*, 98 Conn. 337, 119 A. 218 (1922). The application of the statute might in some cases work a hardship. Yet, the operation and status of adoption as a societal institu-

tion requires the result. The prevalence of adoptions in today's society points to the absolute necessity that adoption effect a complete substitution of families.

Appellants contend that to hold that Knox and George Edward Mitchell have no right nor interest in and to the proceeds of the sale of the land results in a taking of their property without due process of law. The position is without merit. At no time since their birth to the time of the judgment entered has either Knox or George Edward Mitchell had a vested interest in the property or its proceeds; their rights, if any, have been and are contingent.

> "Retrospective statutes destroying or diminishing contingent interests in property do not, per se, deprive the holder thereof of property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States or Article I, § 19, of the Constitution of North Carolina, or violate any other constitutional limitation upon legislative power. *Stanback v. Citizens National Bank,* 197 N.C. 292, 148 S.E. 313." *Peele v. Finch,* 284 N.C. 375, 382, 200 S.E. 2d 635 (1973).

Affirmed.

Judges PARKER and MARTIN concur.