Argued July 24; affirmed October 1; rehearing denied
November 13, 1935

# VAN WINKLE ET AL. *v.* FRED MEYER, INC., ET AL.

## (49 P. (2d) 1140)

456

*Edwin C. Goodenough*, Assistant Attorney General, *Robert F. Maguire* and *Robert M. Kerr*, of Portland (I. H. Van Winkle, Attorney General, and Maguire, Shields & Morrison, of Portland, on the brief), for appellants.

*George W. Mead* and *Robert L. Sabin, Jr.*, both of Portland (Malarkey, Sabin & Herbring, of Portland, on the brief), for respondent Fred Meyer, Inc.

RAND, J. This suit was instituted by the plaintiffs to restrain the defendants from selling ice cream at a

price less than the minimum prescribed by a certain state ice cream marketing agreement, adopted under and pursuant to the provisions of chapter 37, Oregon Laws, Second Special Session, 1933, as amended by chapter 250, Oregon Laws, 1935.

The complaint alleges that, in accordance with the terms of the act, a state marketing agreement regulating the sale of ice cream and fixing 40 cents per quart as the minimum price at which ice cream may be sold at retail in this state was duly entered into and that the defendants are wilfully violating said agreement by selling the same at 29 cents per quart in direct violation of the terms of said marketing agreement.

The defendants demurred to the complaint, challenging its sufficiency on the ground that the act is unconstitutional. The learned trial court held that the act was unconstitutional and, upon that ground, sustained the demurrer and, upon plaintiffs' refusal to plead further, dismissed the suit.

In support of the demurrer, the defendants contend that the act is unconstitutional in that it attempts to delegate legislative power to administrative officers without prescribing any definite or intelligible rule by which the actions of such officers are to be governed or their discretion controlled, and also because the taking effect of the act was made to depend upon authority outside the legislature, and upon the further ground that it denies to the defendants that freedom of contract which is guaranteed and protected by the fourteenth amendment of the federal constitution and by the constitution of this state.

A proper determination of these questions requires a statement of some of the principal provisions of the act. Section 1, as amended, declares that widespread agricultural distress exists, causing the disorganiza-

tion of trade and industry and affecting the public welfare. That, in order to promote the rehabilitation of agriculture, it is the policy of the state to cooperate with the national government in the declared purposes and policy of the National Agricultural Adjustment Act, and, to that end, "to permit and encourage the formulation of and to provide for the enforcement of marketing agreements among producers, manufacturers, distributors and others, handling or processing within the state of Oregon any agricultural product produced or marketed within this state".

Under section 2 of the original act, the governor is authorized to delegate his functions and powers under the act to the state director of agriculture. The amended act in part then provides:

"Sec. 3 (a) The governor of the state of Oregon may approve any marketing agreement among producers, associations of producers, manufacturers, processors, distributors and/or others, handling any agricultural product produced or marketed within the state of Oregon, submitted to the governor for approval under this act, if the governor after public hearing finds that (1) the agreement has been executed or is approved by persons representing a substantial majority of the volume, measured in dollars or units of output, of the intrastate business within this state of the industry or particular subdivision or subdivisions of industry covered by that agreement, and that (2) the provisions of that agreement are not inequitable to the producers of the commodity or commodities covered nor contrary to the interests of the consumers thereof and of the general public. In approving any agreement hereunder the governor may impose such conditions for the protection of consumers, employees and others, and in furtherance of the public interest, and may make or provide for such exceptions to and exemptions from the provisions of the agreement as submitted as he may deem necessary to effect the purposes and policy of this act.

"(b) Any marketing agreement under this act may include such provisions regulating trade and marketing practices and prices in the industry covered, and may contain or provide for such limitation or regulation of production and/or marketing and such other provisions as may reasonably be calculated to aid in the accomplishment of the purposes of that marketing agreement and the purposes and policy of this act. Each marketing agreement shall provide for the establishment of and shall be administered, under the supervision of the governor, by a group of citizen-members of the industry covered, which shall be known as the control board for that marketing agreement.   *   *   * The duties and powers of such board shall be such as are specified for it in the marketing agreement or from time to time delegated to it by the governor or the state director of agriculture. The governor shall maintain or cause to be maintained proper supervision of the financial affairs and records of each control board and, through the state departmental auditing service or otherwise, shall cause to be made an annual audit of the books thereof.

"(c) The governor, whenever any marketing agreement approved hereunder so provides, and if he finds that such is necessary to effectuate its purposes and enforce its provisions, may institute by public announcement and make effective as to all members of the industry covered by that agreement a system of licenses, in which event he shall issue or cause to be issued to each person in that industry a license to engage in the marketing, processing and/or distribution within the state of Oregon of the commodity or commodities involved. Each such license shall be subject to all of the provisions of the marketing agreement approved under this act for the industry involved, and such rules, regulations and orders applicable thereto under that agreement or this act. The governor may at any time revoke or suspend any such license, after due notice and opportunity to be heard, for any violation of the marketing agreement or of this act, or of any applicable rule, regulation or order issued pursuant to this act. Following institution of any such licens-

ing system hereunder, any person who thereafter without such license engages within the state of Oregon in marketing, processing, distributing or handling the agricultural products covered shall be guilty of violation of this act.   *   *   *''

The act further provides that the provisions of any marketing agreement approved under this act, as well as the provisions of any marketing agreement or license approved or issued by the secretary of agriculture pursuant to the National Agricultural Adjustment Act, when not in conflict with the provisions of any marketing agreement in effect under the act, shall constitute the legal standards of fair competition and fair trade practices for industry covered by the agreement in all of its transactions within the state, and exempts from the operation of the act only such persons as are engaged in manual labor and selling the products of such labor. Violation of any such standards by any persons engaged within this state in that industry shall be deemed the use of an unfair method of competition contrary to public policy and the welfare of the state, and shall constitute a violation of the act. The act further provides that a violation of any of the provisions of the act shall constitute a misdemeanor and each and every violation shall be punishable by a fine not exceeding $500 and that each day's continuance of such a violation shall constitute a separate offense.

It will thus be seen that, with the exception of persons engaged in manual labor and selling the products of their labor, the purpose of the act is to subject all persons engaged in the business or industry covered by the act to marketing agreements having the force and effect of law, whether they have assented thereto or not, for a violation of which their goods may be forfeited and they themselves become subject to

criminal prosecution, against which, if the law is valid, they can make no defense. To accomplish that result, all that is necessary to be done is to have a substantial majority, measured in dollars or units of output, of the persons engaged in any particular line or branch of the industry or business covered by the act formulate or approve such an agreement and submit the same to the governor, who is bound to approve the agreement unless he finds that it has not been approved by such a majority or that its provisions are inequitable to the producers or contrary to the interests of the consumers or the general public. Under these provisions, a preponderant majority engaged in any particular line or branch of industry or business covered by the act may, with or without the assent of the others likewise engaged, fix the price of any commodity covered by the agreement and limit and restrict the amount which may be produced or sold. In granting these coercive and unrestrained powers to an indefinite and indeterminate group of persons, the act contains no limitation or restriction upon the exercise by them of the powers so conferred, nor does it prescribe any definite or intelligible rule, standard or guide by which their exercise of such powers is to be governed or their discretion controlled, and leaves wholly to such majority the determination of whether there shall be a law at all and, if there is to be a law, what the terms thereof shall be.

■ Under our constitution, article IV, section 1, the power to make and declare laws, subject only to the initiative and referendum powers reserved to the people, is vested exclusively in the legislative assembly and, by article III, section 1, the powers of government are divided into three departments, namely: the legislative, the executive, including the administrative, and the judicial, and each of said departments is prohibited

from exercising any of the powers conferred upon either of the others. Under these provisions the legislature can not confer upon any person, officer, agency or tribunal the power to determine what the law shall be. This principle was enunciated in clear and unmistakable language by Mr. Justice Agnew in *Locke's Appeal,* 72 Pa. 491 (13 Am. Rep. 716), and in *State v. Briggs,* 45 Or. 366, 370 (77 P. 750, 78 P. 361, 2 Ann. Cas. 424), it was followed and approved by this court. The principle was stated in these words by Mr. Justice Agnew:

"Then, the true distinction, I conceive, is this: The legislature can not delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

After quoting the above in *State v. Briggs,* supra, this court said:

"It is well settled by a long line of authorities in harmony with this doctrine that the power given to an administrative board like the one now under consideration to prescribe rules and regulations reasonably adapted to carry out the purposes and object for which the board is created does not constitute an improper delegation of legislative authority."

The language of the court in *Locke's Appeal,* supra, has also been quoted with approval and the principle followed and applied in *Sandys v. Williams,* 46 Or. 327, 335 (80 P. 642), *Livesay v. De Armond,* 131 Or. 563, 576 (284 P. 166, 68 A. L. R. 422), and *State v. Terwilliger,* 141 Or. 372, 380 (11 P. (2d) 552, 16 P. (2d) 651).

■ Under the very terms of the act in question, there is to be no law fixing the price of any commodity or regulating its production or sale unless a preponderant majority engaged in its production or sale formulate an agreement and secure its approval by the governor. Under the specific directions of the act, when this has been done, the prices so fixed and the regulations so adopted are to become the law of the state, but if no agreement is entered into, then there is to be no law. This leaves wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be. It is impossible to conceive of a more complete delegation of legislative power and, since the act contravenes the plain provisions of our constitution in that it attempts to make an unlawful and unauthorized delegation of legislative power, the act is unconstitutional and void. The same conclusion was reached by the supreme court of Wisconsin in the case of *Gibson Auto Co. v. Finnegan* (259 N. W. 420), in respect to an act very similar in its terms to the one involved here. In that case, the court said:

"It is contended that the act is an unlawful delegation of the power to make and declare laws vested by the Constitution in our Legislature. (Article 4, § 1. The legislative power shall be vested in the Senate and Assembly.) The act under consideration has one distinctive feature which this court has so far never been called upon to consider. No provision of the act can by its terms become effective until some trade or industrial association or group applies to the Governor for his approval of a code. After a proposal has once been submitted, the power of the Governor to modify, amend, or terminate it is aroused; he has no power whatever to initiate a code. His authority is dependent upon his finding (1) that the code has been approved by a preponderant majority of the persons engaged in the trade

or industry as defined in the act; (2) that no inequitable restrictions are imposed; (3) that the code is not designed to promote monopolies, etc.; and (4) that the code is not inequitable as regards the interest of consumers. It is true that the code would have no vitality or legal effect if not approved by the Governor. However, the question of whether or not there shall be a code, which is nothing more nor less than a law relating to a particular industry, is wholly dependent upon the initial determination of the members of an industry. It is conceivable at least that a code might be proposed under the terms of the act by persons not citizens of the United States, which would, when approved by the Governor, become the law of the land.

"It is difficult to conceive of a more complete abdication of legislative power than is involved in this act. Not only is the power to determine whether or not there shall be a law at all delegated to an indefinite class or group, but the Governor and all other public officers are rendered powerless to act except upon the initiative of a preponderant majority of a group. It must be borne in mind that the power delegated is not the power to organize and adopt self-governing ordinances. The power delegated is the power to frame and adopt a code which, when approved, becomes a law with penal sanctions."

The legislature of the state of Washington enacted a similar law to the one involved here, known as the Washington Agricultural Adjustment Act. The purposes of its enactment were the same as those in question here, and it contained many identical provisions with those found in the act involved here. In passing upon its validity, because of the same objections now urged here, the supreme court of that state held the act to be unconstitutional in *Uhden v. Greenough*, 181 Wash. 412 (43 P. (2d) 983), and *Griffiths v. Robinson*, 181 Wash. 438 (43 P. (2d) 977). The act was thereafter amended, seeking to avoid the constitutional objections that had been urged and sustained against its

validity in the two cases cited. As so amended, the act was again held to be unconstitutional as an unauthorized and unlawful delegation of legislative power in *State v. Matson Company*, 182 Wash. 507 (47 P. (2d) 1003).

The constitutional principle which denies to the legislature the authority to delegate the power of making laws and authorizes it to delegate purely administrative functions was stated by the supreme court of Ohio in *Cincinnati, Wilmington, etc. R. Co. v. Clinton County Commissioners*, 1 Ohio St. 77, 88, in these words:

"The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no valid objection can be made."

That language was quoted with approval by the supreme court of the United States in *Marshall Field & Co. v. Clark*, 143 U. S. 649 (36 L. Ed. 294, 12 S. Ct. 495), and again in the recent case of *Panama Refining Co. v. Ryan*, 293 U. S. 388 (79 L. Ed. 446, 55 S. Ct. 241). In the latter case, the court said:

"The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature can not deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determina-

tion of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.''

██ The further objection that this act is unconstitutional because it contains no standard or guide and prescribes no rule of law by which the powers conferred under the act are to be exercised must also be sustained. It is a fundamental principle of constitutional law that in delegating powers to an administrative body the legislature must prescribe some rule of law or fix some standard or guide by which the actions of that body, in administering the law, are to be governed and made to conform. Under this act, there is no rule of law, nor is there any standard or guide prescribed by which the persons to whom the powers are to be delegated are to be controlled or to which they must conform. On the contrary, it leaves to the uncontrolled will of a preponderant majority of any branch of the industry, covered by the act, the power to fix any price and to make any regulation and places no limitation upon the exercise by them of such powers and no limit beyond which they may go in the fixing of prices or in the making of regulations. In the formulation of the agreement, everything is to be left under the act to the unfettered and uncontrolled discretion of the preponderant majority.

The act further provides that the agreement, when formulated and approved, shall be administered by a control board and prescribes that ''the duties and powers of such board shall be such as are specified for it in the marketing agreement or from time to time delegated to it by the governor or the state director of

agriculture'', and there is no limitation placed in the act as to what powers may be thus delegated, or as to what the control board may do.

The act further provides that every person engaged in the particular business or industry covered by the agreement must secure a license before being permitted to engage in such business or industry and that to obtain such license he must agree to conform to all the provisions of the marketing agreement whether he has assented to such provisions or not and regardless of however capricious or unreasonable as to him such provisions may be.

One of the grounds for the holding in *The Panama Refining Company v. Ryan,* supra, that section 709 (c) of the National Industrial Recovery Act, which authorized the president ''to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a state'', was unconstitutional was the fact that it attempted to delegate to the president complete and unlimited power to legislate in regard to a subject matter without reference to any standard and, therefore, was an unauthorized and unlawful delegation of legislative power.

Upon the same ground and for the same reason the National Industrial Recovery Act, which, in the language of Mr. Justice Cardozo, who wrote a concurring opinion, ''sets up a comprehensive body of rules to promote the welfare of the industry, if not the welfare of the nation, without reference to standards, ethical or

commercial, that could be known or predicted in advance of its adoption", was declared to be an unconstitutional delegation of legislative power by the supreme court of the United States in *Schechter Poultry Corp. v. United States*, 295 U. S. 495 (55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947), with which ruling all the judges of that court concurred. In the principal opinion written by Mr. Chief Justice Hughes, the court said:

"But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? And could an effort of that sort be made valid by such a preface of generalities as to permissible aims as we find in section 1 of title 1? The answer is obvious. Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress."

In *Butler v. United States*, 78 Fed. (2d) 1, the United States circuit court of appeals, first circuit, held that the federal Agricultural Adjustment Act, upon which to some extent at least this act was patterned, was unconstitutional because it vested in the secretary of agriculture the power to levy a processing tax upon basic agricultural commodities without prescribing any standard to govern his discretion except the mere purpose of congress to equalize the purchasing power of agricultural commodities. In support of its decision, that court cited numerous federal decisions, among which is *Wichita R. R. & Light Co. v. Public*

*Utilities Commission*, 260 U. S. 48 (43 S. Ct. 51, 67 L. Ed. 124), where the court said:

"In creating such an administrative agency, the Legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function."

The court also cited *Marshall Fields & Co. v. Clark*, supra, where it was held:

"that congress can not delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution."

Among other things, the court then said:

"The power to determine what the law shall be, what property shall be affected by taxation or regulation, and what standards shall govern the administrative officers in administering acts of Congress has never been held to be an administrative function. The power to impose a tax and to determine what property shall bear the tax can only be determined by the legislative department of the government. If Congress undertakes to lay down a guide for an administrative officer to follow in carrying out its mandates, it must be by an intelligible and a reasonably definite standard. Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238; Hampton, Jr. & Co. v. United States, supra, 276 U. S. 394, page 409, 48 S. Ct. 348, 72 L. Ed. 624. The balance between production and consumption of certain commodities, or the equalizing of the purchasing power thereof between certain widely separated periods alone forms no such standard."

Later in its decision, the court said:

"We find no definite intelligible standard set up in the act for determining when the Secretary shall pay rental or benefit payments in order to reduce production of any particular commodity except his own judgment as to what will effectuate the purpose of the act."

The things which the court found to be lacking in the federal law are also lacking in the act now under consideration.

■ Article I, section 21, of our constitution provides: "Nor shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this constitution; provided, that laws locating the capital of the state, locating county seats, and submitting town and corporate acts, and other local and special laws, may take effect or not, upon a vote of the electors interested."

This act does not come within any of said exceptions and, of course, it was never submitted to a popular vote. It will be seen from a mere reading of the act that not only, as we have before stated, the question of whether there was to be a law and, if so, what the terms of the law were to be was to be determined not by the legislature but by an indefinite and indeterminate group of persons representing some particular line of the industry covered by the act but also that the question of when such a law was to go into effect was dependent wholly upon the initiative of persons outside the legislature. This we think is a plain violation of the provision of the constitution last referred to and, in itself alone, would render the act void since it authorizes the making of laws the taking effect of which was made to depend upon the authority of persons not provided for in the constitution.

■ The plaintiffs attempt to avoid these constitutional objections by contending that the act should be upheld as a proper exercise of the police power. This contention must fail because the constitutional prohibitions above referred to apply to the enactment of all laws, whether enacted under the police power or otherwise.

■ ·The next question presented is: Does the legislature of this state have the authority to enact a law fixing the price of agricultural products or regulating and restricting the production and sale thereof, or authorize that to be done by some subordinate state agency? It should be noted in this connection that this act is not a sanitary measure, nor was it designed to prevent the manufacture or sale of any impure food product. Its sole purpose was to raise the price of agricultural products in this state and obviously to restrict the amount which could be produced or sold, and this, we think, was entirely beyond the legislative power. No one, we think, would seriously contend that farming is a business affected with a public interest, nor can it be contended that the business of processing and selling farm products is affected with a public interest. The merchant can hardly be said to have devoted his store and its contents to a public use when he sells or offers to sell some agricultural product or some derivative thereof. The same is true of persons engaged in processing and preparing such products for human consumption. The legislature, under the police power, may pass any reasonable sanitary law to protect the public from the sale of impure or deleterious food products, but this act was not designed for that purpose, nor does it have that effect, and hence it does not come within the police power of the state since the business and industry covered by this act are not affected with a public interest and none of the property used in such business or industry has ever been devoted to a public use. The law upon this question is clearly stated in *Williams v. Standard Oil Co.*, 278 U. S. 235, 239 (73 L. Ed. 287, 49 S. Ct. 115, 60 A. L. R. 596), as follows:

"It is settled by recent decisions of this court that a state legislature is without constitutional power to

fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' Wolff Co. v. Industrial Court, 262 U. S. 522; Tyson & Brother v. Banton, supra; Fairmont Co. v. Minnesota, 274 U. S. 1; Ribnik v. McBride, 277 U. S. 350. Nothing is gained by reiterating the statement that the phrase is indefinite. By repeated decisions of this court, beginning with Munn v. Illinois, 94 U. S. 113, that phrase, however it may be characterized, has become the established test by which the legislative power to fix prices of commodities, use of property, or services, must be measured. As applied in particular instances, its meaning may be considered both from an affirmative and a negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public. Tyson & Brother v. Banton, supra, p. 434. Negatively, it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Id., p. 430. The meaning and application of the phrase are examined at length in the Tyson case, and we see no reason for restating what is there said.''

In *Wolff v. Industrial Court*, 262 U. S. 522 (67 L. Ed. 1103, 43 S. Ct. 630, 27 A. L. R. 1280), the supreme court of the United States held unconstitutional a statute of the state of Kansas, which declared, among other things, that the manufacture and preparation of food for human consumption was affected with a public interest. In that case, Mr. Chief Justice Taft said:

''It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. It is true that in the days

of the early common law an omnipotent Parliament did regulate prices and wages as it chose, and occasionally a Colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances.

"An ordinary producer, manufacturer or shop-keeper may sell or not sell as he likes, United States v. Trans-Missouri Freight Association, 166 U. S. 290, 320; Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252, 256, and while this feature does not necessarily exclude businesses from the class clothed with a public interest, German Alliance Insurance Co. v. Lewis, 233 U. S. 389, it usually distinguishes private from quasi-public occupations. * * *

"In the preparation of food, the changed conditions have greatly increased the capacity for treating the raw product and transferred the work from the shop with few employees to the great plant with many. Such regulation of it as there has been, has been directed toward the health of the workers in congested masses, or has consisted of inspection and supervision with a view to the health of the public. But never has regulation of food preparation been extended to fixing wages or the prices to the public, as in the cases cited above where fear of monopoly prompted, and was held to justify, regulation of rates."

For the reasons stated, the judgment appealed from is affirmed.

BELT, J., did not participate in this decision.

———

BAILEY, J. (dissenting in part). Having reached the conclusion that chapter 37, Oregon Laws, Second Special Session, 1933, as amended by chapter 250, Oregon Laws, 1935, is unconstitutional on the ground that it is an unwarranted delegation of legislative authority, it becomes, in my opinion, unnecessary to determine the question of whether or not the legislature can

constitutionally enact laws having for their purpose the fixing of prices for farm products. Neither the 1933 enactment nor the amendment thereof in 1935 attempted to fix prices at which any agricultural product might be sold. This price feature was brought into the case by the state marketing agreement regulating the sale of ice cream and was, as held in the foregoing opinion, an attempt to confer legislative authority upon a group engaged in marketing certain agricultural products.

In the case of *Nebbia v. People of the State of New York*, 291 U. S. 502 (54 S. Ct. 505, 78 L. Ed. 950, 89 A. L. R. 1469), the supreme court of the United States by a five to four decision upheld the order of the milk control board, acting under the sanction of state legislation, fixing milk prices. The decision therein was followed by the supreme court of appeals of Virginia, in a four to three decision on rehearing, in which the action of the milk commission created under legislation of that state, fixing the price at which milk could be sold, was upheld: *Reynolds v. Milk Commission of Virginia*, 163 Va. 957 (179 S. E. 507). As bearing upon the question of the right of a state to regulate business in the interest of the public, see *Munn v. Illinois*, 94 U. S. 113 (24 L. Ed. 77), and *German Alliance Insurance Company v. Lewis*, 233 U. S. 389 (58 L. Ed. 1011, 34 S. Ct. 612, L. R. A. 1915C, 1189).

As to future legislation seeking to remedy present ills, we do not know what course the legislature may take or what subjects it may cover in an effort to bring about desired economic adjustments. We therefore ought not to attempt to broaden our decision beyond the necessities of the case now before us. For the reasons hereinbefore expressed, I am unwilling to concur in that part of the opinion which declares illegal any legislation fixing the price of agricultural products.