Argued March 2; reversed April 19, 1938

# OREGON CREAMERY MANUFACTURERS AS-
## SOCIATION ET AL. *v.* WHITE ET AL.
### (78 P. (2d) 572)

In Banc.

*Willis S. Moore,* Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellants.

*George W. Mead* and *Robert L. Sabin, Jr.,* both of Portland (Malarkey, Sabin & Herbring, of Portland, on the brief), for respondents.

BELT, J. This is a suit brought under the Uniform Declaratory Judgment Act to have the Oregon Agricultural Marketing Act (Ch. 65, Oregon Laws Special Session, 1935) declared unconstitutional and to enjoin the Director of Agriculture of the state of Oregon from exercising any authority thereunder. From a decree declaring the act unconstitutional and enjoining the Director of Agriculture, the defendants appeal.

There are two fundamental questions presented, (1) Have the plaintiffs alleged and proved a cause sufficient to justify the court in assuming jurisdiction under the declaratory judgment act? (2) Is the Oregon Agricultural Marketing Act unconstitutional?

The original Agricultural Marketing Act (Ch. 37, Oregon Laws Second Special Session, 1933, as amended by Ch. 250, Oregon Laws 1935) was held unconstitutional by this court in *Van Winkle v. Fred Meyer*, 151 Or. 455 (49 P. (2d) 1140). While a petition for rehearing was pending, the legislature enacted the marketing act now under consideration. In section 1 of the act in question, the purpose of the legislation is thus set forth:

"(1) Through the exercise of the administrative powers conferred upon the director of agriculture under this act, to establish and maintain such balance between the marketing and consumption of the agricultural commodities hereinafter specified, and such marketing conditions and practices therefor, as will reestablish prices to producers thereof at a level that will give said commodities a purchasing power (hereinafter referred to as 'exchange value') with respect to articles that said producers buy, equivalent to the purchasing power of said agricultural commodities in the base period of August, 1909, to July, 1914, including current interest, payments per acre on farm indebtedness secured by real estate, and tax payments on farm real estate, as contrasted with such interest payments and tax payments during said base period.

"(2) To protect the interest of the consumer by approaching the level of prices which it is declared to be the policy of the legislature to establish, by gradual correction of the current level at as rapid a rate as may be in the public interest and feasible in view of the current consumptive demand in local and other markets, and authorizing no action under this title which has for its purpose the maintenance of prices to producers above the level which it is herein declared to be the policy of the legislature to establish."

Section 2 defines terms as used in the act and provides that an "agricultural commodity" means a dairy product (except milk or cream produced for human con-

sumption in fresh fluid form) "deciduous fruit, berries, melons, tomatoes, and any vegetable, and any product or by-product thereof, intended for human food, and any regional or market classification of any such commodity or product."

Section 3 provides for investigation by the Director as to "all matters pertaining to the production, processing, manufacture, handling, marketing, distribution, and sale, within this state" of all agricultural commodities covered by the act.

Section 4 provides that if the Director at any time finds: (1) That the current average farm price for any of the commodities is less, or is likely to be less, than the fair exchange value thereof for the current or next succeeding year; and (2) that conditions relative to the production, manufacturing, marketing, and consumption of any commodity are such that the exercise of any powers conferred on the Director would effectuate in whole or in part the declared purpose of the act, the Director shall immediately "institute, make effective, administer and enforce" certain marketing standards as provided in the act, "as he shall find administratively practicable and best calculated to effectuate the declared purpose of the act."

Section 5 purports to authorize the Director to promulgate and enforce the following marketing standards:

(1) Limitation of production.
(2) Allotting production among producers.
(3) Allotting distribution among distributors.
(4) Control and distribution of surplus.
(5) Establishing "reserve pools" and providing for the distribution of the net return from the sale thereof.
(6) Fixing prices at which commodities may be sold by the producer, wholesaler, and retailer.

(7) Regulating the price spreads of processors, handlers, and distributors.

(8) Requiring the filing of price schedules by producers, processors, and distributors.

(9) To specify and prohibit unfair trade practices.

(10) Further and incidental powers.

Section 9 purports to authorize the Director "from time to time" after reasonable notice and public hearing, to "terminate or suspend the operation of any or all marketing regulations under this act" as to any commodity "whenever he finds that said regulations obstruct or are unnecessary for accomplishment of the purposes of this act as to that commodity or product or that class of handlers thereof."

Section 10 provides for review and appeal from the decision of the Director as to any regulation or act affecting persons operating under the act.

Plaintiffs process and distribute approximately 75 per cent of the butter in the state of Oregon, or 22,000,000 pounds of butter annually, having a value of $13,000,000. The record discloses that the Director has made a preliminary investigation of "all matters pertaining to the processing and distribution of butter within the state of Oregon, as provided in section 3 of the act, but that:

"* * * it does not appear as a result of said investigation, or otherwise, that the current average farm price for such agricultural commodities as are alleged to be processed and marketed by plaintiffs herein is less than the fair exchange value thereof, or that the average farm price of such commodities is likely to be less than the fair exchange value thereof for the period in which the production of that commodity during the current or next succeeding marketing year is normally or will be marketed, or that the conditions of and factors relating to the production, pro-

cessing, manufacturing, marketing and consumption of butter within the state of Oregon are such that the exercise of any one or more of the administrative powers conferred upon the Director of Agriculture by said act would effectuate in whole or in part the declared purpose thereof."

The record also shows that whether or not further investigations shall be made or whether "any of the terms of marketing standards * * * shall be made effective, is wholly contingent upon conditions * * * which do not appear as a result of investigations heretofore made by the Director of Agriculture to exist at this time, and whether or not such conditions shall arise at any future time is uncertain and contingent upon facts or circumstances not now known to exist, and which may never arise."

The gravamen of plaintiffs' complaint is specifically set forth as follows:

"That a controversy exists between the plaintiffs and the defendants as to the constitutionality of said statute and as to the extent of the power and authority, if any, of said Director thereunder and that said controversy and the investigations now being conducted by said Director and the existence of said statute as an apparent part of the law of the State of Oregon to which plaintiffs and the members of the Oregon Creamery Manufacturers Association are subject in the conduct of their said business have created a condition of doubt and uncertainty among the plaintiffs and the members of said Association and other persons and corporations engaged in said industry and among the banks with whom the plaintiffs and the members of said Association do business, making it impossible for plaintiffs and the members of said Association adequately to formulate their plans for the operation or expansion of their respective businesses and said condition of uncertainty has and is injuring the credit of plaintiffs and the members of said Association and

diminishing and destroying their ability to borrow funds necessary to finance the operation and expansion of their respective businesses and is restricting and curtailing the volume thereof.''

To support the above allegations, plaintiffs offered evidence which may be thus briefly summarized:

Mr. Earle F. Kaufman, financial correspondent for the Union Central Life Insurance Company, had never read the marketing act in question, but, after a recital to him of its various provisions, he was permitted, in answer to a hypothetical question, to say that he would consider the statute an adverse factor in passing upon the application for loans by persons operating under the statute. The witness admitted, however, that his company had never refused credit to the plaintiffs upon the ground that the statute was in existence. As a matter of fact the witness said, ''We haven't had any applications from a dairyman.''

Robert E. Cavett, a manufacturing retailer in the creamery business, in answer to a question as to the effect of the statute upon his business, said, ''The fact that it is on our statute books, it has a bearing of uncertainty of what we can do and what we might be able to do.'' Witness further testified in substance that it was the fear and apprehension concerning the exercise of authority which the statute vested in the Director which prevented his company from expanding its business.

Frank Hettwer, secretary and manager of the Mount Angel Co-operative Creamery, testified to the same general effect as did Mr. Cavett. He also stated:

''Q. Did you know that the director of agriculture was powerless to promulgate any regulations unless as a result of his investigation certain facts appeared? A. Yes, I realize that; but I also realize that he was

supposed to base his judgment on prices that were in effect back in 1909 to 1914, and those prices could not be had. I know that, too.

"Q. And yet you are afraid he might act under that, something impossible for him to determine? A. Yes, because it was a very dangerous law, to let him have control, because there was no way to form his opinion and decision as to what prices were then and now, so it meant that he might step in at any time and go ahead with the act, without having anything to base it on, because he could presume that prices were different than what they were or are at the present time. It allowed him a groundless base, you might say, to work on."

N. L. Kirchem, president and manager of the Oregon City Creamery Company, testified, in substance, that the act in question was instrumental in preventing an expansion of his company's business and that "our bankers informed us it was a good thing to lay off a while and watch." Kirchem testified that, on behalf of the company, he applied for a loan which the bank refused. In response to the question, "Was that (referring to the statute) the sole ground upon which the bank refused you credit?" he answered, "Well, I don't know why they refused it. They advised me it wasn't a good thing to do."

The above is a condensed statement of all the evidence introduced as a basis for the plea that the court assume jurisdiction and declare the act unconstitutional. At the conclusion of the plaintiffs' case in chief, the court denied the motion of defendants for an involuntary nonsuit and, upon failure of defendants to introduce evidence, entered a decree in favor of plaintiffs in accordance with the prayer of their complaint.

Is this a proper case, in the light of the record, to invoke the beneficent provisions of the Uniform

Declaratory Judgment Act? The answer to this vital question depends upon whether the evidence discloses the existence of a justiciable controversy between adverse parties.

Section 2-1401, Oregon Code 1930, provides:

"Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree."

Section 2-1402, Oregon Code Supplement 1935, provides:

"Any person * * * whose rights, status, or other legal relations are affected by a * * * statute * * * may have determined any question of construction or validity arising under any such * * * statute, * * * and obtain a declaration of rights, status or other legal relations thereunder."

■ That courts have quite universally established the rule that no relief can be had under the declaratory judgment act unless there is an actual bona fide controversy between adverse parties, see numerous cases in notes 12 A. L. R. 66; 19 A. L. R. 1127; 50 A. L. R. 45; 68 A. L. R. 117. Also see 33 C. J. 1101.

In *State ex rel. La Follette v. Dammann*, 220 Wis. 17 (264 N. W. 627, 103 A. L. R. 1089), it is said:

"The requisite precedent facts or conditions which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows: (1) there must exist a justiciable controversy; that is to say, a controversy in which a claim of

right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy, that is to say, a legally protectible interest; and, (4) the issue involved in the controversy must be ripe for judicial determination." Citing Borchard, Declaratory Judgments, pp. 26-27.

In *City of Salem v. Oregon-Washington Water Service Co. et al.,* 144 Or. 93 (23 P. (2d) 539), this court quotes with approval the well-established rule as thus stated in *Petition of Kariher,* 284 Pa. 455 (131 Atl. 265):

"* * * jurisdiction will never be assumed unless the tribunal appealed to is satisfied that an actual controversy, or the ripening seeds of one, exists between the parties."

The following significant language is also noted in the City of Salem case:

"* * * In this day of countless laws a mere charge that some one 'contends and asserts' the invalidity of a particular law, ordinance or charter amendment surely does not confer jurisdiction upon the courts to summons him in so as to end the controversy. If we were to take the opposite view the courts would find themselves engulfed in a mass of litigation involving every citizen in the state."

The writer dissented from the declaration rendered in that case but, after further consideration of the questions involved, is convinced that the decision is sound.

Borchard in his splendid text on Declaratory Judgments (p. 26) says:

"* * * an action for a declaratory judgment must exhibit all the usual conditions of an ordinary action, except that accomplished physical injury need not necessarily be alleged. It is sufficient if a dispute or controversy as to legal rights is shown, which, in the

court's opinion, requires judicial determination—that is, in which the court is convinced that by adjudication a useful purpose will be served. The requisites of justiciability must be present.

"Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant having an interest in opposing his claim. Unless the parties have such conflicting interests, the case is likely to be characterized as one for an advisory opinion, and the controversy as academic, a mere difference of opinion or disagreement not involving their legal relations, and hence not justiciable."

█ Deciding hypothetical cases is not a judicial function. Neither can courts, in the absence of constitutional authority, render advisory opinions. A declaratory judgment has the force and effect of an adjudication. Hence, to invoke this extraordinary statutory relief there must be an actual controversy existing between adverse parties. Particularly should this be so when a court is asked to declare that a co-ordinate branch of the government has exceeded its power by passing a statute in violation of the fundamental or basic law. No court should declare an act unconstitutional unless it is necessary to do so: 6 R. C. L. 76.

In *Electric Bond and Share Company v. Securities and Exchange Commission*, 303 U. S. 419 (58 S. Ct. 678, 82 L. Ed. 643, decided March 28, 1938, the court in refusing to invoke the Federal Declaratory Judgment Act, said:

"The District Court did not err in dismissing the cross bill. Defendants are not entitled to invoke the Federal Declaratory Judgment Act in order to obtain an advisory decree upon a hypothetical state of facts. See New Jersey v. Sargent, 269 U. S. 328; United States v. West Virginia, 295 U. S. 468; Ashwander v. Ten-

nessee Valley Authority, 297 U. S. 288, 324; Anniston Manufacturing Co. v. Davis, 301 U. S. 337, 355. By the cross bill, defendants seek a judgment that each and every provision of the Act is unconstitutional. It presents a variety of hypothetical controversies which may never become real. We are invited to enter into a speculative inquiry for the purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed, cannot now be definitely perceived. We must decline that invitation. Anniston Manufacturing Co. v. Davis, supra."

The divergence of opinion in the courts as to what constitutes a proper case in which to render a declaration depends upon the viewpoint as to what constitutes a justiciable controversy. Some courts have apparently assumed a hostile attitude towards the declaratory judgment and, unmindful of its purpose and function, have required facts sufficient to show the accrual of a cause of suit. Such a restricted use defeats the very purpose and intendment of the act. Other courts have gone to the other extreme and have invoked the statute to adjudicate matters which have never reached the stage of actual controversy nor the "ripening seeds" of a controversy, but are purely speculative and remote.

In our opinion, plaintiffs' case is not ripe for judicial determination. No controversy exists between adverse parties. It is conceded that the Director of Agriculture has promulgated no rules or regulations under the statute, nor has he threatened to do so. We agree that plaintiffs are not obliged to wait until the Director undertakes to enforce some rule or regulation to their damage. We cannot, however, concur in the view that there is reasonable ground for complaint before any rules or regulations have been promulgated. The mere existence of a statute purporting to authorize the Director, under certain conditions, to promulgate and

enforce rules and regulations establishing marketing standards, as set forth in the act, does not of itself create a justiciable controversy. It will be time enough for plaintiffs to complain when the Director exercises any authority purported to be vested in him by the act. Neither does mere difference of opinion as to the constitutionality of the act afford adequate ground for invoking a judicial declaration having the effect of an adjudication: Borchard, Declaratory Judgments, p. 55. The claim of plaintiffs for relief—in its ultimate analysis—is that they fear the Director *might* promulgate and enforce some regulation or rule which *might* affect their business. It may be that this legislation tends towards uncertainty and confusion in the operation of the business in which plaintiffs are engaged, but that criticism might apply to various legislative enactments. Courts, however, insist upon an actual controversy— not a mere difference of opinion concerning the validity of a statute—before jurisdiction will be assumed under the declaratory judgment act.

Plaintiffs rely strongly upon *Taylor v. Haverford Township*, 299 Pa. 402 (149 Atl. 639). That case involved the constitutionality of a zoning ordinance. Taylor owned land materially affected by the ordinance. It had the effect of placing his lot in an area restricted to residential purposes. Taylor petitioned to have his property classified as belonging to a semi-business zone. Such application was denied. Under that factual situation, the court properly assumed jurisdiction under the declaratory judgment act and passed upon the constitutionality of the zoning ordinance. There, as distinguished from the case at bar, issue was joined over a matter substantially affecting the jural relations of the petitioner. A clear-cut dispute existed between one who

had asserted a right and one who had denied the same. Plainly, the case of *Taylor v. Haverford Township*, supra, is not in point.

*Faulkner v. Keene,* 85 N. H. 147 (155 Atl. 195), cited by plaintiffs, also concerned the use of property in the city of Keene which had enacted a zoning ordinance. Plaintiffs had contracted to sell certain land to the Standard Oil Company for a filling station, upon condition that the consent of the city could be obtained. Faulkner, the owner, made application to the city for a license to so use the property, but such application was denied. Hence, there was an actual controversy between adverse parties.

It is urged—but not by counsel—that the decision herein overrules *Multnomah County Fair Association v. Langley,* 140 Or. 172 (13 P. (2d) 354). In our opinion, it does not do so. An examination of the issues in the Langley case plainly shows a real controversy, whereas there is none in the case at bar. In the complaint in *Multnomah County Fair Association v. Langley,* supra, it is alleged:

"The defendants and each of them claim and assert that the said method of conducting said races so adopted and followed by plaintiff violates one, or the other, or both of said statutes, and that they will arrest and prosecute the plaintiff and its agents if said method of conducting said races is followed, and defendants have arrested and are now prosecuting agents of plaintiff for the conduct of said races in the manner and according to method hereinbefore stated."

The motion of the defendants for judgment on the pleadings admitted the truth of the above allegations. Certainly a justiciable controversy existed in that case, but how can it reasonably be contended that the decision rendered therein is controlling here?

It would greatly extend this opinion to review the numerous cases relative to the question as to what factual situation must exist before a declaration may be had by virtue of the declaratory judgment act. Suffice it to say no case has been cited—and none has been found after diligent research—which extends the scope of this procedural act to cover a matter so speculative, remote and uncertain as is disclosed by the record in this case.

■ We are not unmindful that the lower court saw fit to assume jurisdiction of the cause. It is argued that the discretion thus exercised should not be disturbed on appeal unless this court can say there was an abuse thereof. There was no dispute as to the facts. It remained for the court to say, as a matter of law, whether a proper case for a declaration existed. Under such circumstances, no legal discretion was involved.

Having reached the conclusion that no justiciable controversy exists, it follows that the constitutionality of the marketing act in question is not before the court. That question will be reserved for decision when an actual controversy arises.

Neither party will recover costs or disbursements.

The decree of the lower court is reversed and the cause dismissed.

KELLY, J., not sitting.

BEAN, C. J., and BAILEY and LUSK, JJ., concur.

---

RAND, J. (dissenting). I cannot agree with the majority opinion that no justiciable question is involved in this case. Certainly nothing said by Professor Bor-

chard in his valuable work on Declaratory Judgments sustains that conclusion. On the contrary he says:

"With the ever-greater interference by government in the affairs of private individuals, it often becomes important to the individual to test the validity of the interference, *present or proposed, before it is applied or invoked against him.*" (Italics ours.)

Further on in the same paragraph, page 342, he says:

" * * * As a rule, the mere enactment of a statute or ordinance imposing restraints on an individual and implying enforcement by prosecuting officials threatens and hampers the plaintiff's freedom, peace of mind or pecuniary interests, and creates that justiciability of the issue which sustains a proceeding for an injunction and, a fortiori, for a declaratory judgment."

Clearly, if the above is a correct statement of the law, as undoubtedly it is, then these plaintiffs were not bound to wait before commencing action to test the validity of this act until some action had been taken against them to enforce it by the prosecuting officers of the state. Nor does the case of *Faulkner v. Keene,* 85 N. H. 147 (155 Atl. 195), sustain the majority opinion. On the contrary, it holds to the exact opposite of what is said in the majority opinion. Nor was that decision based upon an application made to the city for a license and the denial of such application. Certainly, the making of such application and its refusal by the city, where nothing else was done, affords no ground for making a distinction between that case and this. In that case, the court said:

"Thus it has been held that the mere enactment of a statute or ordinance limiting the use of property, without any attempt to apply it to the complaining party, made cause for injunctive relief."

Further on in the opinion, the court said:

"The objections to it are the product of undue conservatism. 'We have canonized the ancient tradition of a cause of action, in all its original crudeness, and have made it the condition and the measure of judicial action. We have failed utterly to see the enormous and far-reaching possibilities in preventive relief,—prevention not merely of threatened wrongs but prevention of uncertainty and misunderstanding in the assertion of rights. Yet here is an effective, workable system, tried out under conditions identical with those in our own country, which makes an advance over previous doctrines comparable to the great reform which equity made over the harsh rules of the common law. Its use would entail no reconstruction of our judicial machinery, no readjustment of other elements in our remedial system. Its theory and operation are perfectly simple.' 16 Mich. Law Rev. 69, 89.

"Statutes designed to confer such jurisdiction should be construed so as to effectuate their evident purpose. Questions will undoubtedly arise as border line cases are presented. It is sufficient for the disposition of the present controversy to decide that the issue as to the application of the statute and ordinance involved is a proper matter to be determined in such a proceeding, that the situation of the plaintiffs entitles them to invoke the judgment of the court, and that the claims of the defendant are adverse in a sense covered by the act."

In *Terrace v. Thompson*, 263 U. S. 197, 216 (44 S. Ct. 15, 18, 68 L. Ed. 255), (1923), which was a suit in equity to enjoin the attorney general of Washington from enforcing the state alien land law, it was contended that no justiciable question was involved. In that case, the court said:

"They [the appellants] are not obliged to take the risk of prosecution, fines and imprisonment and loss of property in order to secure an adjudication of their rights."

While that was a suit for injunctive relief and not for a declaratory judgment, yet it must be remembered that what will constitute a justiciable issue in the one case, as said by Professor Borchard, will sustain a proceeding "a fortiori, for a declaratory judgment".

In *Pierce v. Society of Sisters*, 268 U. S. 510 (45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468), (1925), the supreme court of the United States sustained Judge Wolverton in enjoining the enforcement of a statute of this state two years before it was to go into effect. In that case, the court said:

"* * * If no relief had been possible prior to the effective date of the Act, the injury would have become irreparable."

So, obviously for the protection of the rights of the plaintiffs in this case, it is not necessary for them to wait until some prosecution has been had or proceedings brought for the enforcement of this act before becoming entitled to test the validity of the act and to have their rights and status under the act determined in this proceeding.

Moreover, the majority opinion overrules *Multnomah County Fair Association v. Langley*, 140 Or. 172 (13 P. (2d) 354). In that case an action, under the uniform declaratory judgments act of this state, was brought to determine whether horse racing was violative of the lottery and nuisance statutes, and the question was determined in that proceeding although there had been no interference with the rights of the plaintiff by any prosecuting officer. The decision in that case was written by Mr. Justice ROSSMAN and concurred in by all the members of his department. Hence, we have the authority of our own court to sustain plaintiffs' right to a declaratory judgment determining the validity of

this act although no prosecution has been had or other proceedings brought to enforce the act. And such is the meaning of the statute when properly construed.

Under section 2-1402, Oregon Code 1930, "Any person * * * whose rights, status or other legal relations are affected by a statute, * * * may have determined any question of construction or validity arising under the * * * statute, * * * and obtain a declaration of rights, status or other legal relations thereunder."

As to the construction of contracts, section 2-1403 provides that it may be construed "either before or after there has been a breach thereof."

Under section 2-1405, the enumeration in the preceding sections of the act "does not limit or restrict the exercise of the general powers conferred in section 1 (§ 2-1401), in any proceedings where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty."

Section 2-1412 provides:

"This act is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations, and is to be liberally construed and administered."

Under these provisions and under the avowed purposes of the act, how is it reasonable to contend that there is no controversy or uncertainty as to the rights, status or legal relations of these plaintiffs as affected by this statute and that there can be none until some steps are taken by some proper officer for its enforcement? Certainly there is as much uncertainty and doubt as to the validity of this statute at this time, although no action has been taken for its enforcement, as there

would have been if such action had been taken prior to the commencement of this action. As pointed out by Borchard on page 343:

"The development of the declaratory judgment in actions against the government to place in issue the validity of administrative action has been a matter of slow growth. It had to make its way in England against the older view that a petition of right was the proper means of challenging the validity of governmental action. But necessity created distinctions. In the famous case of Dyson v. Attorney-General, Dyson asked a declaratory judgment that certain forms issued by the tax authorities and requiring under penalty detailed information as to his property and business were illegal and unauthorized. Over the protests of the Attorney-General that the proceeding should have been brought by petition of right, the Court of Appeal held that the declaration was proper to test the validity of administrative action and that the petition of right was confined to the demanded conveyance of property or money claims against the Crown. Cozens-Hardy on the Chancery side added:

" 'It is no light matter for the Commissioners to issue broadcast forms which purport to impose obligations which do not exist and which add a threat of a penalty in case of non-compliance. A general declaration is pre-eminently desirable in these circumstances.'

Farwell, L. J., remarked in this case:

" 'It would be a blot on our system of law and procedure if there is no way by which a decision on the true limit of the power of inquisition vested in the Commissioners can be obtained by any member of the public aggrieved, without putting himself in the invidious position of being sued for a penalty.' (1 K. B. 410, 421.)"

The author then says:

"It often becomes useful to ask for both a declaration and an injunction; the fear of forfeiting or jeopard-

izing threatened rights may warrant both. The special value of the declaration lies in the fact that it may be issued and may conclusively determine the rights of the parties, notwithstanding the fact that an injunction may for some technical or practical reason be refused.''

On page 349, Borchard sets forth the dangers to which an officer is exposed either in refusing to carry out a statute which he believes unconstitutional or in carrying out a statute which later proves to have been unconstitutional, all of which may be avoided by a declaratory judgment determining whether the statute is valid or invalid. The same is true as to the parties affected by the statute, for as said by Chief Justice Peaslee in *Tirrell v. Johnston,* 86 N. H. 530 (171 Atl. 641, 642):

"* * * When the law is settled it will be obeyed. It is therefore immaterial whether the proper proceeding is an application for a restraining order or a petition for a declaratory judgment. A final interpretation of the law in either form of proceeding would be binding upon these parties.''

Upon this subject, Borchard says, p. 380:

"Those who have rights under contract or statute are frequently faced with a threat or risk of breach or violation by the defendant. Their fear of loss and prejudice persuades them to seek to avoid a breach by suing for a declaration of their rights. Such a declaration serves as a warning to the defendant and reassures the plaintiff in the enjoyment of his rights. It removes the cloud generated by the threat or danger of improper action by the defendant, confirms the plaintiff's rights, and stabilizes a doubtful or uncertain or challenged legal relation. It thus serves a most important social function in settling disputed rights at the inception of the controversy, saves from destruction and violence an existing *status quo*, preserves contracts against threatened breach, holds parties to their contractual and

statutory duties, and avoids the economic and social damage which breach would entail. It acts as a preventive and conservatory measure, saving existing relationships from the risks of breach, violation, injury, and destruction. Issue is joined while the relationship still exists and before irretrievable losses have occurred by reason of one or the other party acting upon his own interpretation of his rights.''

From this it will be seen that, unless the whole weight and authority of Borchard's work on Declaratory Judgments is repudiated, the majority opinion in this case cannot be sustained. Moreover, the majority opinion characterizes the uniform declaratory judgments act as beneficent legislation, yet it so limits the operation of the act as to destroy one of the most vital purposes which it was intended to accomplish.

Thus far we have not referred to the act which the plaintiffs challenge in this action. It is the act known as the Oregon Agricultural Marketing Act (chapter 65, Oregon Laws Special Session, 1935). It is largely a re-enactment of the same provisions that were contained in the original Agricultural Marketing Act (chapter 37, Oregon Laws, 2d Special Session, 1933, as amended by chapter 250, Oregon Laws 1935). That act was held unconstitutional by this court in *Van Winkle v. Fred Meyer*, 151 Or. 455 (49 P. (2d) 1140), and the present act is unconstitutional for the same reasons as were set forth in that case.

To hold, therefore, as the majority opinion does, that, before the plaintiffs will be permitted to have the constitutionality of this act determined, their rights must be wrongfully interfered with and they, themselves, subjected to prosecution and to the imposition of fines and penalties for their refusal to conform to it, is, in my opinion, clearly erroneous and contrary to the

overwhelming weight of authority upon that question in this country and in all other English-speaking countries.

For these reasons, I dissent.

———

ROSSMAN, J. (dissenting). The majority seem to believe that this proceeding cannot be maintained unless the plaintiffs succeed in proving that they actually have been injured through the challenged statute. Such being their belief, the majority quote from some of the testimony for the purpose of showing that it is doubtful whether any substantial injury has been suffered. But, as was said in *City of Salem v. O. W. Water Service Co.*, 144 Or. 93 (23 P. (2d) 539), to which the majority refer with approval:

"Ordinarily a suit or action cannot be maintained until all three of the following elements are present: (a) a duty owing by the defendant to the plaintiff; (b) a breach of that duty; and (c) damages sustained by the plaintiff as a result of the breach. The Declaratory Judgment Act dispenses with the two elements last mentioned and is satisfied if controversy exists concerning the first."

The authorities cited in that decision and those cited by Mr. Justice RAND in his dissenting opinion in this proceeding convince me that this proceeding ought not be dismissed. The issue is not whether the plaintiffs have been damaged. The very purpose of declaratory judgments acts is to enable the courts to step in before damage is inflicted. The majority believe that it is necessary to wait until the Director of Agriculture has conducted more meetings, has promulgated some rules, or has issued some orders, and, finally, until he has proceeded with the enforcement of his rules and orders. Very likely the majority decision will encourage him

to proceed; but it does not seem to me that it is necessary to wait that long when, as in the present instance, a large number of responsible citizens of this state, in good faith, challenge the validity of an act under which the public officer is proposing to proceed. Our sole concern should be whether a declaratory judgment announced in this proceeding will terminate the controversy concerning the validity of the statute. If it will not, § 2-1406, Oregon Code 1930, authorizes us to refrain from entering a decree or judgment. The very fact that much controversy exists concerning the validity of the challenged enactment is good reason for proceeding. I believe that we should proceed and determine whether the challenged statute is constitutional or otherwise.

For the above reasons, I dissent.