Argued and submitted September 27, 1993, affirmed May 25, 1994

John P. HENDERSON
and Henderson Aviation Co., Inc.,
*Petitioners,*

*v.*

DEPARTMENT OF AGRICULTURE,
Bruce Andrews, Director,
*Respondent.*

(603-714-NR021-91; CA A76943)

875 P2d 487

Timothy E. Miller argued the cause for petitioners. With him on the brief were Laura Van Harlingen Potter and Martin, Bischoff, Templeton, Langslet & Hoffman.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and Riggs and Haselton,* Judges.

DEITS, P. J.

---

* Haselton, J., *vice* Durham, J.

## DEITS, P. J.

Petitioners seek review of a final order of the Oregon Department of Agriculture (ODA) imposing civil penalties for four violations of the State Pesticide Control Act. ORS chapter 634. We affirm.

Petitioners are a licensed pesticide applicator and his employer, a licensed pesticide operator.[1] In 1991, the ODA issued to each petitioner a Notice of Imposition of Civil Penalty based on four aerial applications of pesticide. OAR 603-57- 510(5). A contested case hearing was conducted at petitioners' request, ORS 634.905(2), for which the four violations against each petitioner were consolidated. The facts as found by the director of the ODA are summarized here and are not in dispute.

On April 18, 1990, petitioners applied the pesticide Thiodan by aerial spray to a Christmas tree farm located near the Alpine Elementary School playground. During the application, approximately 85 children and two teacher's aides were on the school playground. In response to a complaint from one of the aides regarding the spraying, an ODA pesticide investigator went to the school the following day and took a swab sample from the swingset and a composite sample of grass cuttings from the playground. The samples tested positive for endosulfan, the active ingredient in Thiodan.

On June 29, 1990, petitioners aerially applied the pesticide Tilt to a grass field owned by Heitzman. Before the application, the pesticide was mixed in 7.5 gallons of water per acre. The Tilt label requires that, for aerial application, the pesticide be mixed in a minimum of 10 gallons of water per acre.

On May 15, 1991, petitioners applied the pesticide Bravo by aerial spray to a grass seed field adjacent to the Laird residence. In response to Laird's complaint that the spray landed on his lawn, two ODA pesticide investigators took a sample of grass cuttings and dug a soil sample from his

---

[1] A pesticide applicator is one who sprays or applies pesticides for others, is authorized to work for and is employed by a pesticide operator, and is in direct charge of or supervises the spraying or application of pesticides. ORS 634.006(9). A pesticide operator is one who "owns or operates a business engaged in the application of pesticides upon the land or property of another." ORS 634.006(13).

backyard. The grass sample tested positive for the active ingredient in Bravo.

On July 1, 1991, petitioners applied the pesticide Lorsban to a Christmas tree farm adjacent to Parker's property and in the vicinity of Berg's property. Parker, who heard the helicopter, but could not see it because of haze, keeps cattle and dogs on his property. Berg, who observed the application of the pesticide, has an organic strawberry field on his property. In response to Berg's complaint, an ODA investigator took samples from his property on the day of the application and took a grass sample from Parker's property a few days later. The samples from Berg showed no detectable amount of the active ingredient in Lorsban, but the Parker sample tested positive. The Thiodan, Bravo and Lorsban labels all stated: "Do not apply this product in such a manner as to directly or through drift expose workers or other persons."

For each application, the director concluded that petitioners applied pesticides inconsistent with the directions on the pesticide labels in violation of ORS 634.372(2). The director then applied the ODA's penalty formula, OAR 603-57-500 to OAR 603-57-530, and imposed a civil penalty of $4,310 against each petitioner. ORS 634.900; ORS 634.915.

■     Petitioners first assign as error the director's conclusion that ORS 634.372(2) does not violate Article I, section 21, of the Oregon Constitution.[2] That statute provides:

"No person shall:

"* * * * *

"(2)   As a pesticide applicator or operator, intentionally or willfully apply or use a worthless pesticide or any pesticide inconsistent with its labeling, or as a pesticide consultant or dealer, recommend or distribute such pesticides."

Petitioners contend that because the legislature gives to pesticide manufacturers "the right to decide what goes on the

_____

[2] Article I, section 21, provides, in pertinent part:

"[N]or shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution[.]"

label," the statute impermissibly delegates legislative authority to private entities. *See Van Winkle v. Fred Meyer, Inc.*, 151 Or 455, 462, 49 P2d 1140 (1935).

We disagree. The statute does not, as petitioners suggest, blindly incorporate into law whatever a pesticide manufacturer chooses to put on its label. Federal and state laws require that, with limited exceptions, all pesticides must be registered with the Environmental Protection Agency (EPA) and the ODA, respectively. 7 USC § 136a(a); ORS 634.016(1). Under federal law, a pesticide will not be registered until the administrator has approved the label. 7 USC § 136a(c)(5)(B), (6); 40 CFR § 156.10(a)(6)(i). Similarly, in reviewing a registration application that must include the proposed label, the ODA may restrict or limit the use in Oregon of any pesticide. ORS 634.016(4)(d), (6)(a). For a label to be approved and a pesticide to be registered, the manufacturer must follow the specific labeling requirements imposed by a comprehensive federal regulatory scheme[3] and, to a lesser extent, state law.[4] Thus, even assuming that pesticide

---

[3] There are several labeling regulations that pertain to the use of a pesticide, the aspect of the labels at issue here. Under the category of warnings and precautionary statements, 40 CFR § 156.10(h)(2)(i)(A) provides:

"Where a hazard exists to humans or domestic animals, precautionary statements are required indicating the particular hazard, the route(s) of exposure and the precautions to be taken to avoid accident, injury or damage. The precautionary paragraph shall be immediately preceded by the appropriate hazard word."

Under the regulations specifically governing the directions for use, 40 CFR § 156.10(i)(2)(x)(F) provides that the directions must include "[a]ny limitations or restrictions on use required to prevent unreasonable adverse effects," including "pertinent information which the Administrator determines to be necessary for the protection of man and the environment." The directions must also include "[t]he method of application, including instructions for dilution, if required." 40 CFR § 156.10(i)(2)(vi).

For each of the above provisions, the administrator of EPA must determine if the label provided by the manufacturer satisfies the appropriate standard. For other federal labeling requirements, however, the regulations specify the exact language that the manufacturer must use. For instance, 40 CFR § 156.10(i)(2)(ii) provides that the directions for use must include the statement, "It is a violation of Federal law to use this product in a manner inconsistent with its labeling."

[4] The Federal Insecticide, Fungacide and Rodenticide Act (FIFRA), 7 USC §§ 136-136y, and its implementing regulations control the use and application of pesticides, but the states retain some regulatory authority. 7 USC § 136v(a). For purposes of uniformity, a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 USC § 136v(b). As a supplement to the federal pesticide labeling

labels written by manufacturers are given the effect of law, we do not believe that the statute has left "wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be." *LaForge v. Ellis*, 175 Or 545, 549, 154 P2d 844 (1945) (holding statute invalid as violative of Article I, section 21); *see also Van Winkle v. Fred Meyer, Inc.*, *supra*, 151 Or at 461.

■ Petitioners also argue that the director erred in failing to hold that ORS 634.372(2) and the labels that it incorporates are unconstitutionally vague. That argument is inapposite, however, because the vagueness analysis applies only to penal, not civil, laws. *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980).

■ Petitioners next assign error to the director's interpretation of the term "expose" as used on the pesticide labels. In evaluating whether petitioners violated ORS 634.272(2) by applying pesticides in a manner that "exposed" workers or other persons, the director defined the label term "expose" to mean "creates a situation where a person may come into contact with the pesticide." Petitioners' sole challenge to that definition is based on their argument that the EPA defines expose as "actual contact" and that the director is bound by that definition under the federal statute requiring uniformity of pesticide labels. 7 USC § 136v(b). Petitioners concede that the term "expose" is not defined in the federal statute or regulations; however, they make their argument relying on a statement made in a commentary accompanying a proposed amendment to a worker protection regulation. They argue that even though the comment was made regarding a worker protection regulation, it is applicable here because the language used on the labels most likely derived from that regulation.[5] Petitioners also claim that, in amending the worker

requirements, ORS 634.026(1)(e) requires that every pesticide label include "[a]dequate and necessary directions for its proper and intended use."

[5] Before it was amended, the worker protection regulation at issue, 40 CFR § 170.3(a), provided, in part:

"No owner or lessee shall permit the application of a pesticide in such a manner as to directly or through drift expose workers or other persons except those knowingly involved in the application."

protection regulation, the EPA clarified it by substituting the term "contact" for the "less precise term 'expose.'" 53 Fed Reg 25974, 25988 (1992).[6] Therefore, they argue, the EPA intended those terms to be equivalent. Petitioners then conclude that when the EPA approved the labels at issue here, it interpreted "expose" to mean "contact" and that the director is bound by that interpretation.

We are not persuaded by any of petitioners' arguments on this point. First, we do not agree that the proposed amendment and commentary to the worker protection regulation constitute "the EPA's express and unambiguous interpretation" of the term "expose." Rather than reading the EPA's commentary to mean, as petitioners suggest, that contact is a more precise way of saying expose, we read the commentary to mean that contact is a more precise *term* than expose. Thus, regardless of what the EPA may have "always" intended, the director's definition of "expose" is consistent with the EPA's commentary, which recognized that "expose" is subject to broad interpretation. Further, even if the EPA had intended "contact" when it said "expose," it did so in respect to the application of a worker protection regulation, not in the context of labeling requirements. As petitioners readily admit, the EPA did not require the exact language of the worker protection regulation to appear on pesticide labels.[7] Consequently, we do not see how the director's failure

---

[6] In 1988, the EPA proposed to revise its regulations governing worker protection from agricultural pesticides. 53 Fed Reg 25970 (1988). According to the EPA,

"[t]he wording of certain requirements in the present Part 170 [governing worker protection] leaves room for broad interpretation due to lack of specificity. Under these circumstances, enforcement is difficult for the Agency and potentially unfair to those with Part 170 duties." 53 Fed Reg 25974.

In reference to what was then 40 CFR § 170.3, application restrictions, the EPA proposed several changes, the last of which provided:

"The term 'contact' has been substituted for the less precise term 'expose.'" 53 Fed Reg 25988.

The regulation governing application restrictions for purposes of worker protection now reads:

"The handler employer and the handler shall assure that no pesticide is applied so as to contact, either directly or through drift, any worker or other person * * *." 40 CFR § 170.210(a).

[7] The EPA's regulations now impose a labeling requirement specifically directed at worker protection. 40 CFR § 156.206(a) provides, in part:

"Each product shall bear the statement: 'Do not apply this product in a way

to follow the EPA's "interpretation" of "expose" in the context of worker protection would violate section 136v(b)'s prohibition against imposing a *labeling requirement* "in addition to or different from those required" under FIFRA.

In their fourth assignment of error, petitioners argue that the director's interpretation of ORS 634.372(2) was wrong as a matter of law. ORS 183.482(8)(a). Specifically, petitioners take issue with the director's interpretation of the phrase "intentionally or willfully apply or use * * * any pesticide inconsistent with its labeling." The director held:

> "In the context of ORS 634.372(2), the term 'intentionally' means that a person intends to make application of a pesticide (*i.e.*, he does so purposefully, and not accidently or inadvertently), but not that he also intends to make the application contrary to the directions on the label. This interpretation includes negligent conduct, but is not limited to such conduct as ORS 634.372(4)."

ORS 634.372(4) provides that no person shall "[p]erform pesticide application activities in a faulty, careless or negligent manner."

According to petitioners, subsection (2) of ORS 634.372 prohibits intentional misapplication of pesticides and subsection (4) prohibits negligent misapplication of pesticides. They argue that when the ODA elected to prosecute an intentional misapplication instead of a negligent one, it was required to prove that petitioners intentionally applied a pesticide inconsistent with its label. Petitioners contend that the director's interpretation of subsection (2) renders subsection (4) meaningless because it treats a "deliberate action resulting in a label violation as an intentional violation of the terms of the label, merging the negligent and intentional violations."

■■ In construing statutes, our task is to discern the intent of the legislature, looking first to the text and context of the provision at issue. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Whenever possible, we will construe provisions of a statute so as to give

---

that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application.' "

effect to each. ORS 174.010; *PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611.

■    Considering the words of the statute as well as its context, we conclude that the director's construction of the statute is consistent with the legislature's intent. In ORS 634.012, the legislature states that the purpose of the State Pesticide Control Act is to regulate in the public interest, *inter alia*, the application and use of pesticides. The legislature recognized that although pesticides may be necessary and valuable, they can cause injury to health, property, wildlife or environment when applied or used in an improper or careless manner. ORS 634.012. In view of the extensive labeling requirements imposed by federal law, prohibiting the use of a pesticide in a manner inconsistent with its label advances the legislature's policy of preventing injury. The prohibition provides an incentive to operators and applicators to read the labels of the pesticides and thus decreases the risk of injury from improper use. Construing the statute in the manner urged by petitioners would not carry out that purpose because it would condone negligent noncompliance with label requirements. An operator or applicator who does not read a label could completely avoid prosecution for the noncompliance, despite the potential for injury.

■    In addition, contrary to petitioners' assertions, the director's construction of ORS 634.372(2) preserves the distinction between ORS 634.372(2) and ORS 634.372(4). As discussed above, subsection (2) does not prohibit intentional misapplications of pesticides; rather, it requires strict compliance with *all* label specifications whenever operators or applicators intentionally use or apply pesticides. Whether an operator or applicator intended to violate a label may be considered in assessing a penalty, ORS 634.915(2)(e), but it is immaterial to the determination of whether a violation has occurred.

Subsection (4), on the other hand, targets *application activities* that are performed in a "faulty, careless or negligent manner." Although a pesticide applied in such a manner might effectuate a labeling violation, not all label specifications are directed at the manner of application. Consequently, a pesticide may be used inconsistent with its label even though the manner of application is neither faulty,

careless nor negligent. For instance, a label specification concerning the storage and disposal of a pesticide has effect regardless of whether the pesticide is ever applied. Other specifications, such as those prohibiting grazing dairy or meat animals in treated areas, are directed at activities that occur *after* an application has been completed. Under petitioners' construction of subsection (2), however, applicators would not be committing a violation if they applied a pesticide properly but, because they failed to read the entire label, did not comply with the requirements concerning storage, disposal or grazing. ORS 634.372(2) would not be violated because, although the pesticide was used inconsistent with its label, the inconsistent use was not intentional. ORS 634.372(4) would not be violated because the application was not performed in a careless or negligent manner. Petitioners' construction thus produces a result that defeats the legislature's expressed purpose in regulating the use and application of pesticides. The director did not err in construing ORS 634.372(2).

■      In their next assignment of error, petitioners argue that the director erred in refusing to dismiss the three label violations alleging drift of pesticides. Petitioners argue that the ODA did not establish by a preponderance of the evidence that drift was the mechanism of transport for any of the pesticides from the targeted sites to the neighboring properties. Specifically, petitioners argue that the positive samples offered by the ODA were insufficient in number to establish drift.[8] After reviewing the record, we conclude that substantial evidence supports the findings underlying the director's inference that the pesticides reached the neighboring properties through drift. ORS 183.482(8)(c).

■      Contrary to petitioners' assertions, the director's comment that petitioners offered no evidence of another means of transport did not shift to them the burden of proof on the issue. The absence of any evidence to suggest that the pesticides moved by means other than drift supports the *reasonableness* of the inference that the pesticides did move

---

[8] The director defined drift as "a movement of particles of pesticide through the air at the time of application." That definition is not challenged here, nor do petitioners challenge the historical facts underlying the director's inference that the pesticides moved by drift.

by drift. *City of Roseberg v. Roseberg City Firefighters*, 292 Or 266, 271-72, 639 P2d 90 (1981). Had petitioners offered evidence of another means of transport, that evidence might have cast doubt on the reasonableness of the inference, even if it was insufficient to support a finding as to that other means.

■ Petitioners next argue that because the ODA failed to prescribe a reasonable time for them to eliminate the violations, as required by ORS 634.900(2), the violations should have been dismissed. We disagree. ORS 634.900 provides:

"(1)  In addition to any other liability or penalty provided by law, the Director of Agriculture may impose a civil penalty on a person for violation of any of the provisions of this chapter relating to pesticide application, sale or labeling. The civil penalty for a first violation shall be a fine of not more than $1,000. Upon a second violation, the department may impose a fine of not more than $2,000.

"(2)  A civil penalty may not be imposed under this section for violations other than those involving pesticide application, sale or labeling violation under this chapter. The director in every case shall prescribe a reasonable time for elimination of a violation:

"(a)  Not to exceed 30 days after first notice of a violation; or

"(b)  In cases where the violation requires more than 30 days to correct, such time as is specified in a plan of correction found acceptable by the director."

However, even if we assume that the requirement of prescribing a reasonable time for elimination of a violation is applicable here and that the ODA's failure to do so here affected the director's authority to impose civil penalties, dismissal of the violations would be not be warranted. Under OAR 603-57-500(6), a violation is the commission of any prohibited act specified in ORS 634.372. Once it is established that a prohibited act has been committed, the violator is subject to one or more penalties.[9] Because the repercussions of having committed a violation extend beyond the imposition of a civil penalty, the validity of the penalty as imposed has no

[9] Under ORS 634.992, all violations are unclassified misdemeanors and are punishable by a fine or by imprisonment. Under ORS 634.322(4), any violation may serve as a basis for the ODA to revoke, suspend or refuse to issue or renew the violator's license or certificate.

bearing on the fact of the underlying violation. Thus, while the parties may debate whether the director properly imposed the civil penalty here, there is no question that the alleged impropriety is not grounds for dismissing the *violations*.[10] The director did not err in denying petitioners' motion to dismiss the violations.

Petitioners' final assignment of error does not merit discussion.

Affirmed.

---

[10] Because of our disposition of this issue, we need not address whether, under ORS 634.900(2), the director's authority to impose a civil penalty is conditioned on his having prescribed a reasonable time for the violator to eliminate the violation. Nor do we need to address whether that "condition" applies in a case such as this where the violation has already been committed and is not susceptible to "elimination."